UNITED STATES of America, Plaintiff,

v.

Giacomo DINORSCIO, Gerald Cohen, Manuel Monteiro, Gerald De Luca, Thomas Marino, Dick Pearson, John Sinico, Frank Suppa, Vincent Di Pasquale and Anthony Truglia, Defendants.

Crim. A. No. 86–223.

United States District Court,
D. New Jersey,
Criminal Division.

June 3, 1987.

Samuel A. Alito, Jr., U.S. Atty. by Joseph Braunreuther, V. Grady O'Malley, Asst. U.S. Attys., Newark, N.J., for plaintiff.

David A. Ruhnke, West Orange, N.J., for defendant DiNorscio.

Ashley & Charles by Thomas R. Ashley, Newark, N.J., for defendant Cohen.

Shaljian, Cammarata, O'Connor & Messano by Thomas J. Cammarata, Jersey City, N.J., for defendant DeLuca.

John R. Howes, Fort Lauderdale, Fla., for defendant Marino.

Andrew K. Ruotolo, Jr. by Elizabeth Joyce, Newark, N.J., for defendant Sinico.

Coogan, Pandolfe, Shaw & Rubino by Robert A. Coogan, Brielle, N.J., for defendant Truglia.

**BARRY, District Judge.**

It is an unhappy fact of life, but fact it be, that motions for new trials pressing juror irregularities, such as are now before me, are being brought with increasing frequency in the federal courts.

■ Without pausing to speculate as to the reasons underlying that fact, it is at least fair to say that disappointed defendants serving lengthy terms of incarceration will quite understandably use every weapon at their disposal to set aside their convictions.[1] One of those weapons, these defendants appear to believe, is case law which they read to mandate that at their say-so—without reference to the quality or lack thereof of the purported irregularity; without reference to the circumstances of how that irregularity came to the court, and from whom; and without reference to the trial record—they have the right to a hearing and quite probably to a new trial.

■ But it is settled law that the decision as to what is prejudicial to a fair trial when issues of juror irregularities are raised is a matter that must, to a large extent, be left to the discretion of the trial judge. *See, e.g., Mattox v. United States,* 146 U.S. 140, 147, 13 S.Ct. 50, 52, 36 L.Ed. 917 (1892). That discretion comprehends not only the ultimate determination of prejudice, but also the preliminary decision as to the nature and scope of hearings, if any, to be conducted on such issues. *Government of the Virgin Islands v. Dowling,* 814 F.2d 134, 137 (3d Cir.1987); *Tillman v. United States,* 406 F.2d 930, 938 (5th Cir.), *remanded on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

■ Courts are and should be hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences. As the Court of Appeals for the Second Circuit explained in *United States v. Moten,* 582 F.2d 654, 666–67 (2d Cir.1978), and again in *United States v. Sun Myung Moon,* 718 F.2d 1210, 1234 (2d Cir.1983) *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984), a trial court is required to hold a post-trial hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant. *King v. United States,* 576 F.2d 432, 438 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978).

■ "It is perfectly plain that the jury room must be kept free of evidence not received during trial, and that its presence, *if prejudicial,* will vitiate the verdict." *Government of the Virgin Islands v. Joseph,* 685 F.2d 857, 863 (3d Cir.1982), *quoting Dallago v. United States,* 427 F.2d 546, 553 (D.C.Cir.1969) (footnotes and citations omitted) (emphasis supplied). If there is reason to believe that jurors have been exposed to prejudicial information, the trial judge is obliged to investigate the effect of that exposure on the outcome of the trial. *United States v. Vento,* 533 F.2d 838, 869 (3d Cir.1976). In *Dowling, supra,* 814 F.2d at 139, while addressing the trial court's failure to adequately evaluate potential prejudice during trial, the Court of Appeals for the Third Circuit stated that "[i]n every case where the trial court learns that a member or members of the jury may have received extra-record information with a *potential for substantial*

---

**1.** The six defendants before me on this motion are currently serving lengthy terms of incarceration following their convictions for cocaine trafficking. Those convictions are currently on appeal to the Court of Appeals for the Third Circuit. When a new trial is sought under F.R. Crim.P. 33 while the direct appeal is pending, a district court has the power to entertain and to deny the motion, and to grant the motion once

the court's intention to do the latter has been certified to the appellate court and the case remanded. *United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984). *See also Venen v. Sweet,* 758 F.2d 117, 123, n. 7 (3d Cir.1985): "if an appeal is pending, the court may grant the motion only on remand of the case."

*prejudice,* the trial court must determine whether the members of the jury have been prejudiced." (emphasis supplied).

There is, however, no obligation for the judge to conduct an investigation where no foundation has been established. *United States v. Vento, supra,* 533 F.2d at 869–70. Stated somewhat differently, it is clear that a hearing is not held to afford a convicted defendant the opportunity to conduct a fishing expedition. *United States v. Moten, supra,* 582 F.2d at 667.

What also becomes clear from an analysis of the host of cases that address juror irregularities is that extreme care must be taken in assessing the precedential value of particular holdings and of apparently pertinent language contained therein. The considerations found controlling in one case involving an infiltration of extra record facts concerning a defendant on trial are not necessarily controlling in another case involving such infiltration. And the considerations found controlling in cases involving coercion of jurors either by fellow jurors or by third parties are not necessarily compelling, or, indeed, even applicable in a case, as here, where no such allegations are made. As the Court of Appeals for the Third Circuit has regularly noted, the citation of apparently pertinent language does not rise to the level of black letter law. *United States v. Berrigan,* 482 F.2d 171, 174 (3d Cir.1973); *United States v. Malinowski,* 472 F.2d 850, 854, n. 4, (3d Cir.), *cert. denied,* 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973). And although the circumstances in the decided cases are instructive, the circumstances of each case are *sui generis.*

A more careful analysis of the facts and the law than the defendants are willing to undertake is required. Analysis of all that is before me—how this application came to be, what it came to say, and how it must be viewed in light of the record of this case and controlling legal principles applicable to juror irregularities—leads irresistibly to the plain and simple conclusion that defend-

ants' motion for a new trial should be denied, and denied without a hearing. Indeed, to rule that even a hearing is required on the paltry submission made to me would render nugatory the sound policy of protecting jurors from post verdict harassment and inquiry and would encourage, in other cases, attempts to tamper with jury verdicts.

The suspect nature of this application is first evidenced by the event which allegedly triggered the defense investigation into one juror and the cast of characters who participated thereafter.[2] According to paragraph 4 of the motion for a new trial, on November 17th, 1986, one Donna Nave, a friend of defendant Cohen's wife, accompanied Mrs. Cohen to the sentencing of defendants DiNorscio and Cohen. Ms. Nave on that date "recognized [the juror's] name", an incredible assertion given that no juror's name was mentioned at sentencing. Ms. Nave, paragraph 4 continues, knows the juror's daughter, who told Ms. Nave that her mother "was" a juror in federal court in Newark. It was thereafter "determined" that one James Papeika lives in a two family house on the floor above the juror, and an "investigation" was undertaken.

Evidence of the suspect nature of this application continues to mount as one takes a look at the source of the purported jury influence, a revealing step often considered in evaluating possible prejudice. *United States v. Armstrong,* 654 F.2d 1328, 1332–33 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982); *see also United States v. Jones,* 707 F.2d 1169, 1173 (10th Cir.), *cert. denied,* 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983); *United States v. Hendrix,* 549 F.2d 1225, 1227–28 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

The "investigation" was commenced by one George Policastro, a friend of Papeika and a relative by marriage of defendant DiNorscio. Statement of Papeika at pp. 2 & 6. Apparently around the Christmas

**2.** The juror, for reasons so obvious as to not require discussion, will not be identified in this opinion.

holidays, Policastro approached Papeika and asked Papeika if he had ever said anything to the juror about DiNorscio and Cohen, both of whom Papeika had met in Florida years earlier when he and Policastro were on vacation and had used one of DiNorscio's cars, had dined at DiNorscio's home and had gone out with DiNorscio on DiNorscio's boat. *Id.* at 1 and 2.

Papeika responded that he had had "a little conversation" with the juror. *Id.* at 6. Asked by Policastro if he would be willing to tell this to DiNorscio's attorney, Papeika said that he would think about it but did not know if he wanted to get involved. *Id.* He later met with counsel for DiNorscio and Cohen, had a "conversation", and agreed to meet again at which time he would give a formal statement. It is that statement, presented in Q and A format, with questions framed and posed by counsel for Cohen, that forms the basis for this new trial motion.[3]

Papeika, so the statement goes, spoke to the juror about the case on two occasions as she was leaving home early in the morning. On the first occasion, he asked her where she was going and she responded that she was on jury duty in a drug case in federal court. *Id.* at 3. No impropriety is alleged as to this conversation and defendants use it only to enable them to argue that there was not merely the one conversation at issue in this case but "several". Cohen Brief at 5. Four or five days later,

Policastro told Papeika that DiNorscio and Cohen were on trial in federal court on drug charges. Papeika put "two and two together", and thereafter engaged the juror in the second conversation, the conversation as to which defendants wax eloquent. Statement of Papeika at 3 and 4.

Papeika told the juror (1) that he had met both DiNorscio and Cohen in Florida; (2) that Policastro and he had spent time with DiNorscio in Florida and had gone out on DiNorscio's boat; (3) that DiNorscio had "all kinds of cars", *i.e.* two Cadillacs, a Lincoln and a Corvette; (4) that he did not know how DiNorscio and Cohen got the house, boat and all of those cars, and they must have gotten the money for those things from someplace; and (5) that DiNorscio had been shot five times by his cousin.[4] *Id.* at 4. That, and that alone, is the "prejudicial extrinsic information" (Marino Br. at 1) on which this application is based.[5]

I can say with assurance that this information is as good as it is going to get for defendants, at least through Papeika. This is not a case, after all, in which a purported contact with a juror requires factual development of the contours of the contact itself such as is seen in so many of the cases cited to me. This is not a case, in other words, in which Papeika stumbled into court but, rather, one in which Policastro, a relative of DiNorscio and a man whom the Government describes as "defendants' em-

---

**3.** The motion before me is based on the ground of newly discovered evidence and thus was timely filed under F.R.Crim.P. 33. *Government of the Virgin Islands v. Joseph,* 685 F.2d 857, 863 n. 3 (3d Cir.1982). On a motion for new trial based on this ground, facts must be alleged from which the court may infer diligence on the part of the movant. *United States v. Ianelli,* 528 F.2d 1290, 1292 (3d Cir.1976). The Government argues that the facts alleged by defendants indicate quite the contrary—it was before Christmas 1986 when Policastro first spoke to Papeika, yet the defendants did not obtain Papeika's statement until at least a month later and delayed almost six weeks before presenting it to the court. I reject the Government's request to deny this motion on that ground.

**4.** I reject Papeika's conclusions as to what he believes he "led the juror to believe" or what he believes he "implied to her". *Id.* at 4. Indeed,

were there a hearing, an objection to Papeika testifying as to such conclusions would be sustained.

**5.** The motion for a new trial is brought by defendant Marino and all defendants have joined therein. No defendant other than DiNorscio and Cohen was referred to explicitly or implicitly by Papeika and, aside from those defendants, only Marino goes beyond a mere citation of cases and suggests any factual basis for relief. Aside from Marino's rather desperate argument that the government's evidence disclosed that he, too, had no visible means of employment and that he, too, had a luxurious residence (Marino Br. at 13–14), he argues that that part of the standard conspiracy instruction which told the jury that the acts and statements of the co-conspirators are attributable to each other entitles him to relief. Given the disposition herein, I need not reach this issue.

issary", sought out his friend Papeika because defendants "determined" that he lived in the same house with a juror.

Papeika was questioned by Policastro; he was later questioned by counsel for Cohen, presumably in depth and at length; and he then responded to specific questions defense counsel knew would elicit the responses they sought and was permitted to remain non-specific where that would be helpful. For example, while it is clear from pp. 2 & 4 of Papeika's statement that it was DiNorscio's house, DiNorscio's boat, and DiNorscio's cars, counsel for Cohen left unchallenged Papeika's final observation that "I don't know how *they* got the house, boat and all of those cars. I referred to DiNorscio and Cohen as those guys. I said that *they* must have gotten that money from someplace," *Id.* at 4 (emphasis supplied). The ambiguous "they" is utilized by counsel for Cohen to now allege that the juror was told of the unexplained wealth of *his* client.

I will assume that Papeika told the juror precisely what he claims to have told her.[6] I will further assume that Papeika was the "third-party supplier of information", Cohen Br. at 9, rather than the agent of one or more of the defendants going in to intentionally taint a juror in a trial he knew was ongoing.[7] And I will make some further assumptions. I assume that defendants have met their burden of demonstrating an irregularity. I also assume that the standard articulated in *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), a case wholly different on its facts from this one, in which the court stated that the burden shifts to the Government to prove that the presumptive prejudice which the irregularity creates was harmless, applies here. The burden, however, shifts only if the improper contact involves the matter pending before the jury. That matter, as the Third Circuit held in *United States v. Boscia,* 573 F.2d 827, 831 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978), is the guilt or innocence of the defendant. I note in passing that whether one speaks in terms of a rebuttable presumption of prejudice or the fairness of a defendant's trial, the result would be the same.

No suggestion has been made that Papeika expressed any opinion as to the guilt or innocence of any defendant. Moreover, no suggestion can seriously be made that the fact that Papeika met DiNorscio and Cohen in Florida and the fact that at sometime in the past DiNorscio had been the victim of a crime related in any way to guilt or innocence in this case or were prejudicial in any other respect. The remaining statements, even when analyzed in the light most favorable to the defendants, referred merely to unexplained money which permitted purchase of a house, a boat and cars. Defendants argue, however, that this information was "strongly corroborative", Cohen Br. at 10, of the Government's theory that both Cohen and DiNorscio, despite being unemployed, maintained a luxurious lifestyle. Papeika's statement, according to the defendants, that DiNorscio and Cohen must have gotten the money from someplace "could only mean that they were involved in illegal activities" *Id.* Thus, the argument goes, by linking DiNorscio and Cohen

---

6. In this connection, defendant Cohen raises the subsidiary point that "although the court had previously admonished the jurors to report any contact with outsiders which may have a bearing on the case, [the juror] failed to do so." Cohen Br. at 1. That admonishment reads differently than Cohen suggests: "You are not to speak to any of the parties, their attorneys or their witnesses. If anyone attempts to speak to you, I expect you to report that to me promptly." The "anyone" in this context can only mean the parties, their attorneys or their witnesses.

7. While I make these assumptions for the purposes of this motion, the credibility of Papeika's statement is undercut in my view by his attribution to the juror of the observation that "one guy always falls asleep." To paraphrase Justice Frankfurter, I cannot ignore as a judge what I know as a woman. *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (1949). In *United States v. Accetturo,* in which defendants DiNorscio, Cohen and a host of others are currently on trial, defendant DiNorscio is, or was at the time this motion was filed and until he decided to proceed *pro se,* attempting to make something akin to a sleeping sickness record. If Mr. DiNorscio dozed off more than once in the trial before me, I did not see it.

together the "clear inference" was created by Papeika that if one of them was a criminal the other must have been. *Id.* As a result, defendants conclude, the statements of Papeika were about the matter pending before the jury.

What DiNorscio and Cohen choose to ignore is that even if one permits one's imagination to run wild, as defendants have done in parlaying Papeika's innocuous statements into the grim conclusions that they suggest those statements imply, defendants' scenario is wholly consistent with *their* theory of the case.

The opening statement of counsel for DiNorscio led the way.[8] "DiNorscio", counsel began, "is a criminal. He's been a criminal a long time." Tr. 57. Moreover, counsel continued, DiNorscio met William Hawley, one of the Government's main witnesses, in prison, while DiNorscio was serving time as a bookmaker. Tr. 57 to 59. He also dealt in stolen jewelry, had "robbed other criminals", Tr. 59, and, at the time of the events at issue in this case, was in Florida "committing criminal acts". Tr. 65. Indeed, when the FBI searched DiNorscio's house they found "proceeds of [his] criminal activity." Tr. 58. Counsel promised the jury that it would hear a conversation about DiNorscio buying a Rolls Royce and that the jury was "free to surmise" that it was being bought with the proceeds of criminal activity. Tr. 68. DiNorscio knew "these criminals" who were to be the Government's witnesses, and his defense was simply this: "in fact, there is criminal activity going on but it's not narcotics activity," Tr. 69, and, to the extent that the Government's witnesses speak of narcotics, they will be lying.

Counsel for Cohen, while denying that his client was a criminal, did not argue that Cohen did not know and was not associated with DiNorscio, did not suggest that Cohen had any legitimate means of employment or support, and did not suggest that he lacked substantial assets. He, too, argued that the Government's witnesses were lying, although he acknowledged, as one of the tapes forced him to acknowledge, that

Hawley went to Cohen for money. Tr. 91–92.

The closing statement of counsel for DiNorscio was a rehash of his opening, and then some. DiNorscio did more than associate with criminals and know each of the Government's three main witnesses. Tr. 2725–2745. DiNorscio *was* a criminal, Tr. 2725–2742, a fact proved with regard to approximately eight different crimes, Tr. 2725, and was then under indictment in yet another case. Tr. 2755. He deals in cash, counsel continued, Tr. 2752; has ripped off $453,000 from other criminals, Tr. 2786, and, to put it charitably, has collected outstanding loans, Tr. 2787; and was involved in a gambling scheme to cheat people in Tennessee, Tr. 2788. After discussing DiNorscio's physical, mental and social attributes, or lack thereof, counsel allowed as how some people would say, "What a scumbag." Tr. 2785.

Apparently, all of this became somewhat contagious, albeit a contagion exercised with eminently more discretion. Counsel for Cohen referred to one witness's testimony that Cohen drove a Mercedes Benz and did not suggest that that was not so. Tr. 2811. And, counsel for Cohen continued, Cohen knew DiNorscio and knew one Vincent DiPasquale, who had been arrested on a cocaine run in Tennessee, and conceded that Cohen had DiPasquale's beeper number on him when he was arrested. It was this "association" with criminals that "got him here". Tr. 2867.

It is simply beyond the pale that there is any inconsistency between these openings and closing statements and Papeika's observations to the juror that DiNorscio and Cohen were together on one occasion and that there was a boat, a house and cars purchased with money from "some place". It is fair to say that with reference to these matters there was utterly no factual contradiction between the parties with Papeika's observations providing the missing corroborative link. *See Government of the Virgin Islands v. Joseph,* 685 F.2d 857, 864 (3d Cir.1982).

Even if Papeika's observations were not wholly consistent with defendants' theory

---

8. Counsel for DiNorscio on this motion did not represent DiNorscio at trial.

of the case, when one considers the evidence adduced on the Government's case, this application for a new trial can only be characterized as ludicrous in the extreme. Those few matters of which Papeika spoke even arguably relevant to guilt or innocence came out of the mouths of the Government's witnesses over and over again. Those witnesses, who were believed by the jury and who were, in my opinion, as credible as any witnesses of their type that I have seen, delivered a hydrogen bomb. I will not dignify this application with a recital of the specific evidence from each of those witnesses with reference to the specific allegations defendants press as the flyswatter to extinguish the hydrogen bomb. I am satisfied simply to note certain of the direct testimony of William Hawley, untouched on cross-examination.

DiNorscio, Hawley testified, was not employed; rather, his income came from narcotics and Cohen was his partner in narcotics. Tr. 187–189. Cohen, too, was not employed, yet spent money at the race track and went to the golf course every day where he played golf all day for a thousand dollars a hole. Tr. 184, 195, 212. DiNorscio spent his money on expensive cars—he had at that time two Mercedes 500 SL's—and on jewelry, women, $1500 meals, a swimming pool at his home, and cocaine for his own use. Tr. 210, 211, 438.

Hawley saw the proceeds from drug transactions every week, he continued, at DiNorscio's house and at co-defendant Truglia's house—hundreds of thousands of dollars at one time. Tr. 207. DiNorscio and Cohen each got one of the four piles into which the money was divided, Hawley delivered $40,000 to $50,000 to Cohen on each of approximately ten occasions, and Hawley delivered money to DiNorscio as well. Tr. 208 to 210. Cohen, on one occasion, complained to DiNorscio that he was owed $300,000 on drug deals and wanted DiNorscio to get it for him because Cohen's lawyers were starting to run him into money and he was having problems with the IRS. Tr. 444. DiNorscio, Hawley continued, had "ripped off a guy" for $450,000. Tr. 445.

A house, a boat and cars. They must have gotten the money from "some place". That is all that Papeika said. To imply, as defendants would have me imply, that Papeika was responsible for the suggestion that the defendants were involved in illegal activities which permitted them certain worldly goods, or that Papeika corroborated and thus made strong a weak Government case, borders on the irresponsible.

When I recall the testimony of William Hawley, Robert Fisher and Greg Hamilton, I am reminded of Justice Minton's observation in *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953), that the record "fairly shrieks" the guilt of the defendants. When I recall those portions of that testimony relevant to the issue before me, and as only highlighted above, I am convinced to a moral certainty that the statements pressed to me can best be characterized in the Second Circuit's word as mere "molecules" and could not possibly have influenced this jury, particularly given the "abundant properly admitted evidence" concerning the matters to which these molecules were arguably relevant. *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.) *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *See also United States v. Friedland*, 660 F.2d 919, 928, (3d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982). The motion for a new trial is denied.

Before concluding, I note that by letter dated April 9th, 1987, counsel for defendant Truglia writes that "part of the investigation hints at the existence of a near fatal drug overdose suffered by the juror's daughter-in-law in or about 1971 which resulted in her admission to Union Memorial Hospital. This episode was not disclosed to the court or counsel by the juror."

The Government correctly observes that while this bald innuendo is entitled to no consideration with respect to the motion for a new trial, it does warrant consideration for what it reveals about defendants' endeavors with regard to that motion. Clear-

ly, states the Government, the juror has been targeted post-trial to provide the basis for a new trial and more than one way of accomplishing that result is being explored, even if that means delving back 16 years into the life of a juror's in-law in search of seeds of bias, and even if it includes Papeika, because "he felt a personal interest in the juror," telling her that he had been approached by "an investigator" about his conversation with her. Statement at 5.

One or more defendants is apparently seeking to do through the back door what he is expressly prohibited and apparently carefully avoiding doing through the front. I remind the parties and their counsel of the rules governing the courts of this state and this district, which provide in effect that except by leave of court granted after good cause shown, no attorney or party shall himself or through any investigator or any person acting for him, interview, examine or question any grand or petit juror with respect to any matter relating to the case. Together with my order denying a new trial, I will order that the defendants and their agents, the defense attorneys and their agents, and the Government attorneys and their agents, be restrained from communicating with or contacting in any manner whatsoever, any juror or alternate juror in this case without prior consent of the court. One final note, if any defendant persists in seeking information about a juror or jurors from sources other than the juror himself or herself, and brings that information to me as something more substantial than a "hint" of something that may have occurred 16 years ago, I assure him that whatever "investigation" led to such information will be carefully scrutinized. *See State v. La Fera*, 42 N.J. 97, 199 A.2d 630 (1964) (extensive, professional post-conviction investigation among relatives, friends and associates of jurors in hope that something would be found to impeach verdict offended spirit of what is now N.J. Court Rule 1:16–1).