**UNITED STATES of America**

**v.**

**Thomas GILSENAN and Ralph Cicalese, Appellants.**

**Nos. 91–5166, 91–5167.**

United States Court of Appeals, Third Circuit.

Argued Sept. 5, 1991.

Decided Nov. 15, 1991.

Rehearing Denied Dec. 24, 1991.

---

Peter W. Till (argued), Goldstein, Till, Lite & Reiken, Newark, N.J., for appellant Gilsenan.

Michael Critchley (argued), West Orange, N.J., for appellant Cicalese.

Michael Chertoff, U.S. Atty., Edna B. Axelrod, Asst. U.S. Atty., Eric L. Muller (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Before STAPLETON, GREENBERG, and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### BACKGROUND

This criminal case is before this court on appeal from an order entered on February 21, 1991, denying new trials. In 1988 the appellants Ralph Cicalese and Thomas Gilsenan, law enforcement officers employed by the prosecutor of Essex County, New Jersey, were charged in a 41–count indictment with numerous offenses including ones arising under the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Hobbs Act arising from

narcotics corruption. The appellants pleaded not guilty and a jury trial was to begin on October 3, 1989.

However, by October 2, 1989, the appellants and the government reached a tentative plea agreement on which a hearing was scheduled on that day. The appellants requested that these proceedings be held *in camera* as they were concerned that the plea agreement might be rejected and that the resulting publicity could prejudice them in jury selection. The district court denied the motion and the plea agreement was then recited in open court. The agreement provided that the appellants would plead guilty to a one-count information charging them with conspiracy to violate the Hobbs Act but that neither would be incarcerated. Instead, each would be placed on probation for five years and would agree not to seek reinstatement of his employment with the Essex County Prosecutor. Inasmuch as the agreement provided for a specific sentence, it was subject to district court approval pursuant to Fed.R.Crim.P. 11(e)(1)(C) and Fed.R.Crim.P. 11(e)(2).

After the terms of the agreement were stated, the court asked why a noncustodial disposition was appropriate. The assistant United States attorney explained that the plea would demonstrate the appellants' guilt and would remove them as law enforcement officers, results more significant than the imposition of punishment. The government then acknowledged that its case was difficult "in terms of proof." Ultimately the district court rejected the agreement as it regarded the proposed punishment as insufficient.

As the appellants contemplated, there was considerable publicity regarding the plea agreement. The *Star–Ledger*, said to be the New Jersey newspaper with the greatest circulation, ran an article on October 3, 1989, indicating that the district court rejected the agreement declaring it would not violate its principles and roll over and play dead. The article said that the authorities tried "to quietly dispose of a much-heralded police drug corruption case by offering guarantees of freedom to two accused lawmen in exchange for their guilty pleas." It further recited that the court noted that the government lacked confidence in its case and that one of the defense attorneys said the case was an "institutional embarrassment" and that the government "had proposed the plea deal in a desperate effort to save face." The article then quoted the appellants' attack on the government's case and indicated that they insisted they were innocent. The article referred to the plea as a "surprise government proposal" and stated that the appellants' attorneys said they only "agreed to consider the proposal" because it was an "irresistible temptation" to do so as the appellants were facing 50–year terms regardless of whether or not they were innocent. Remarkably, the article never said that the appellants agreed to accept the proposal, though that inference can be drawn from it.

On October 4, 1989, there was a similar article in the *Star–Ledger*. The article stated once again that the "federal authorities had attempted to quietly dispose of the case by offering to guarantee the defendants probation in exchange for guilty pleas, but the deal was angrily rejected by" the district court. The thrust of this article, as had been that of the day earlier, was that the government's case was weak and the appellants were maintaining their innocence.

There was other publicity regarding the proposed agreement. The Associated Press distributed an article, which was apparently run in at least one newspaper on October 3, 1989, along the same lines as that in the *Star–Ledger*. It referred to the government having made a "plea proposal" and said that the assistant United States attorney "conceded that the case was a tough one for the government." It also appears that there was television coverage of the plea proceedings but the record does not reveal its content.

The jury was selected on October 3, 1989, a process that seems to have caused the court no particular difficulty. Some jurors who had read about the plea agreement were excused and ultimately 16 jurors, including Patricia Spraguer, were selected.

Spraguer, however, was excused after several weeks of service during the trial. As might be expected, the court instructed the jury not to read or listen to anything about the case other than what was presented in court. The trial was lengthy as evidence was given on 24 days over a six-week period. On December 8, 1989, after a week of deliberations, the jury convicted Gilsenan on 13 counts and acquitted him on 11, and convicted Cicalese on 15 counts and acquitted him on six.[1] Following the denial of motions for a new trial and the imposition of long terms of incarceration, the appellants filed direct appeals but we affirmed their convictions by judgment orders without opinion.

The appeals now before us were directly triggered by a letter dated November 7, 1990, from Richard A. Rosen, a professor of law at the University of North Carolina, to Cicalese's attorney, enclosing an affidavit of Patricia Spraguer dated November 6, 1990. In her affidavit Spraguer explained that she was then a law student at the University of North Carolina and in the course of a criminal law class realized "that something that happened during the trial may be a significant error."[2] She said that on what she remembered as the second day of the trial several members of the jury were aware that there had been a plea offer the night before and that this development was discussed in the jury room. She said that someone said "[t]hey had offered to settle, but the judge said no because no time would be served." She then said that the matter had been on television and she believed that several jurors may have seen the report on television or read about it in the newspaper. She attributed the words regarding the settlement offer to a juror named "George." She also indicated that when the jury was

asked by the court that day or the next whether it knew anything that would affect its opinion she said nothing because she honestly felt that what she had heard would not affect her decision.

Armed with Spraguer's affidavit, Cicalese and Gilsenan moved directly for new trials pursuant to Fed.R.Crim.P. 33 and, alternatively, asked for a hearing on the application in the expectation that they could develop evidence which would be the basis for a new trial. In addition to supplying Rosen's letter and Spraguer's affidavit, Cicalese's attorney filed an affidavit indicating that Rosen had brought the jury matter to his attention by a telephone call to him on October 25, 1990. He said that he discussed the matter with Gilsenan's trial attorney and they asked Rosen to prepare the affidavit.[3] He also indicated that they were able to verify the affidavit to the extent of determining that there had been a juror named "George" on the jury. Cicalese's attorney attached the *Star–Ledger* articles to his motion.

The district court denied the motions for a new trial on February 11, 1991, in an opinion from the bench. The court pointed out that Spraguer's affidavit was vague and in some respects was inaccurate. The court then indicated that on October 3, 1989, because of the initial *Star–Ledger* article, it asked the jury array whether anyone had heard or read about the case. Six persons responded affirmatively but two were not excused as they were "utterly vague" about what they heard or read though the other four were excused. After lunch the jurors were again asked whether they had read about the case and none responded. The jurors were qualified in groups and as the members of each group were asked if there was any reason they could not be fair there was no re-

---

**1.** There seems to be some confusion in the record with respect to count 41, a charge against Gilsenan for obstruction of justice. According to the docket sheets he was found not guilty on this count but the judgment of conviction recites that he was found guilty on it. Our division of 13 convictions and 11 acquittals treats the judgment as correct. If the docket sheets are correct the division is 12 and 12, a difference having no significance on this appeal.

**2.** While the record is not clear on the point, we infer that Spraguer became a law student after her jury service in this case.

**3.** Gilsenan has been represented by a different attorney on this appeal.

sponse.[4] The jurors were instructed not to read about the case or listen to radio or watch television accounts regarding it.

In its opinion the court then said that notwithstanding the inconsistent and inaccurate statements in Spraguer's affidavit it would view the matter from "the most favorable scenario" for the appellants that:

> at least several sitting jurors were aware that there had been a plea offer which I had rejected and the matter was discussed in the presence of all the sitting jurors with the words Miss Spraguer remembers being 'They offered to settle, but the judge said no because no time would be served.'

App. at 221.

The court also said it would assume that the *Star–Ledger* articles were the source of the awareness of the jurors as the appellants pressed the articles on it.

The court nevertheless ruled that the appellants were not entitled to a hearing or a new trial. It indicated, citing *Government of Virgin Islands v. Dowling*, 814 F.2d 134, 139 (3d Cir.1987); *United States v. Vento*, 533 F.2d 838, 869 (3d Cir.1976); and *United States v. DiNorscio*, 661 F.Supp. 1041, 1042–43 (D.N.J.1987), *aff'd sub nom. United States v. DiPasquale*, 864 F.2d 271 (3d Cir.1988),[5] *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989), "that [the] information not only did not prejudice the defendants but did not even have the potential for prejudice." It said that each case involving an application of the kind presented was *sui generis, DiNorscio*, 661 F.Supp. at 1043. It pointed out that the thrust of the *Star–Ledger* articles was that the government's case was weak and the court was perturbed that the government brought it. It then indicated that even if there had been some prejudice from the article of October 3, 1989, it was clearly dissipated as there was no allegation that the jurors discussed it after the time mentioned in Spraguer's affi-

davit. Furthermore, the lack of prejudice was demonstrated by the circumstance that the jury verdict was not returned until after seven days of deliberations on December 8, 1989, and included acquittals on many counts.

The court then indicated, citing *Dowling*, 814 F.2d at 139, that "not every exposure to extra-record information about the case will require a new trial" and that the district court is in the best position to determine "what a given situation requires." *Id.* at 137. The court determined that in this case nothing was required and that "even assuming that at a hearing Miss Spraguer's averments were tested under oath and found to be true, a finding I have assumed, a new trial would not be warranted." On February 21, 1991, the court entered the order denying a new trial and this appeal followed.

The appellants take two positions on this appeal. First, they contend that the district court abused its discretion in denying the motion for a new trial because there was a reasonable possibility that the unrebutted information in Spraguer's affidavit prejudiced them by affecting the jury's verdict by enhancing the possibility of convictions. Second, they contend that assuming that presumptively prejudicial extraneous information concerning the plea proceeding was presented to the jury, the district court abused its discretion when it refused to conduct an evidentiary hearing to determine the precise nature, quality and extent of the jury breach.

## ANALYSIS

Preliminarily in considering the merits of the appeal it is important to recognize that there are two general sources from which the jurors or some of them could have obtained information regarding the plea negotiations. One source was from the media publicity and the other was from anoth-

---

**4.** Of course, a failure to respond meant that a juror had nothing to bring to the court's attention.

**5.** In this opinion we refer to the district court's opinion in *DiNorscio* several times on the issue

of jury prejudice. On the appeal in *DiNorscio* we affirmed without discussion of the district court's reported opinion as we found the appellants' contentions on the point to be plainly without merit. 864 F.2d at 273 n. 1.

er juror.[6] There is nothing in the record which suggests that any juror heard of the negotiations from any other source and the appellants do not claim that any did. It is also important that we recognize that the request for a hearing raises significant considerations not present in the direct request for the new trial as a meaningful hearing would require that jurors be questioned, a delicate matter indeed. *See McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915).

### The motion for a new trial

■ We deal first with the denial of the motion for a new trial. As the appellants acknowledge, we review the district court's order on this point to determine if it abused its discretion. *Government of the Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir.1985). Thus, we must determine if on the record already made the appellants have demonstrated they suffered substantial prejudice from the information. *See Dowling*, 814 F.2d at 139; *United States v. Armocida*, 515 F.2d 29, 49 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). We make this determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror. *United States v. Boylan*, 898 F.2d 230, 262 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).[7]

■ We are quite unable to understand how the media attention could have possibly prejudiced the appellants.[8] Rather, from an objective point of view, quite the opposite is true as the newspaper accounts made it appear that the government's case was extremely weak and that it was desperate to salvage something from the prosecution. Furthermore, the articles made it clear that the government had made the plea proposal and they indicated that it was the government which wished to dispose of the cases quietly. The articles further reflected the court's displeasure with the government and the appellants' assertions of innocence. We think that from an objective point of view a defendant would be very happy to have a juror discover that the government was willing to admit on the eve of trial that it had a weak case.

While the statement of the juror that "[t]hey had offered to settle, but the judge said no because no time would be served" cannot fairly be characterized as helpful to the appellants, neither was it substantially prejudicial. The statement did not suggest that appellants admitted they were guilty as it simply suggested that they wanted to dispose of the case without incarceration. We also point out that this statement was made to the jury at a time that the court was cautioning it that it must decide the case on the basis of the formal presentations in court.

While, as we have indicated, we decide this case from an objective viewpoint, we think it not inappropriate to point out that the appellants themselves have supplied the court with evidence of the actual or subjective impact of the allegedly prejudicial material. Ordinarily it would not be possible to obtain such evidence following

---

6. The district court indicated that it would assume that the jurors became aware of the information from the *Star–Ledger*. While the record does not justify this assumption we see no reason to remand the matter for reconsideration for in fact the district court recognized that some jurors may have obtained their information from the discussion among the jurors and there is nothing in the record to support a conclusion that the nature of the other media reporting was different from that in the *Star–Ledger*.

7. We do not find that the circumstances of this case are close to being sufficiently aggravated to give rise to a presumption of prejudice to the appellants. *See United States v. D'Andrea*, 495 F.2d 1170, 1172–73 (3d Cir.), *cert. denied*, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974). *See also United States v. Boylan*, 898 F.2d at 261. But even if there was such a presumption, it was rebutted by the overall facts here which show that the extra-record information was harmless.

8. Inasmuch as the appellants did not supply evidence of the content of the television reporting of the proceeding on the motion for the new trial, it is not part of the record so we cannot infer that the television reporting was prejudicial to them. In any event we have no reason to believe that the content of the telecast or telecasts was different in substance from that in the newspapers.

the return of the verdict because under Fed.R.Evid. 606(b) "a juror may not testify ... to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith...." Here, however, we are not barred by Rule 606(b) from considering Spraguer's affidavit as she was excused during the trial and thus her mental state had nothing to do with the verdict. Therefore, we are not considering a statement by a juror who actually deliberated as to whether information about the plea proposal affected the verdict. Significantly, Spraguer explained that she did not report the receipt of the information to the court when asked if she knew anything that would affect her opinion because she honestly felt that what she had heard would have no such effect. Neither, of course, did any other unexcused juror. It was only after Spraguer went to law school that she perceived the material as prejudicial. But we are not considering whether the evidence was prejudicial from the perspective of a law student and we know that Spraguer *as a juror* did not find it prejudicial.

■ While we have determined that even on an examination of the situation when the allegedly prejudicial information was received there was no basis to find prejudice we do not stop there. After all, what really counts is whether the jury was influenced by the plea agreement when it deliberated and delivered its verdict, as we are concerned with the information's effect on the verdict rather than the information in the abstract.[9] In this case the allegedly prejudicial information was received at the outset of the trial and was followed by a mass of evidence delivered over a 24–day, six-week period. Then the jury deliberated

for a week and delivered a fractured verdict showing that it carefully delineated among the offenses and between the appellants. This, of course, was after the jury was instructed to decide the case on the basis only of the evidence and not extrinsic information, an instruction the jury is presumed to have followed. *See Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985). We cannot conceive in these circumstances that the allegedly prejudicial information could have had an impact on the verdict.[10]

### The request for a hearing

■ The appellants' second argument is that the district court abused its discretion when it refused to conduct an evidentiary hearing to determine the precise nature, quality and extent of the "jury breach." Undoubtedly there is precedent to support the conclusion that in some cases the district court will abuse its discretion in not ordering a hearing to ascertain what extra-record information the jury has received. After all, how can a court determine on an objective standard the effect of information on a hypothetical average juror if it does not know what that information was? Thus, in *United States ex rel. Greene v. New Jersey*, 519 F.2d 1356 (3d Cir.1975), we held that the district court correctly granted a writ of habeas corpus when a state court did not conduct a voir dire *during a trial* to determine if a jury had been exposed to prejudicial information that the defendant had attempted to plead *non vult* during the trial and to ascertain whether, if the jury had been so exposed, it could nevertheless render a fair and true verdict.[11]

More recently in *Government of the Virgin Islands v. Dowling*, 814 F.2d 134, we held that the district court erred in not

**9.** This concern of the effect on the verdict means the effect on the hypothetical average juror, not the actual effect.

**10.** The appellants make what they characterize as the "tangential" contention that they were prejudiced because the jurors were not responsive at the voir dire as they did not reveal that they had received the prejudicial information. There are two problems with this. To start with it was not raised as a basis for a new trial in the district court and accordingly has not been pre-

served as an issue on the appeal. *See United States v. Batka*, 916 F.2d 118, 120 (3d Cir.1990). Furthermore, it is not clear from the record that when the voir dire was conducted the extraneous material had been received by the jury.

**11.** The allegedly prejudicial material here cannot be equated with that in *Greene* as here the plea agreement contemplated a no-time sentence whereas in *Greene* the defendant by pleading guilty exposed himself to a life sentence. Furthermore, in *Greene* the thrust of the publici-

determining what extra-record information the jury received and, if it received such information, whether the jury could be relied upon to ignore it and confine its deliberations to the record evidence. In *Dowling* we considered that the information had the potential for substantial prejudice because it related to the facts of the case and because the defendant had a prior conviction for bank robbery, the same charge as in the case being tried.[12] We indicated, however, that "not every exposure to extra-record information about the case will require a new trial." *Id.* at 139. *See also United States v. Boscia,* 573 F.2d 827, 831 (3d Cir.) ("[T]he failure to provide a full evidentiary hearing into possible prejudice resulting from communications with jurors does not, in itself, require a reversal or remand."), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). In *Greene* and *Dowling* the claim that the jury had received allegedly prejudicial information came to the court's attention *during the trial.*

Here, however, we cannot conclude that the district court abused its discretion in not holding a hearing. *Dowling,* 814 F.2d at 137. The purpose of a hearing is to determine what happened, that is to establish the historical record. Accordingly, a hearing need not be held at the behest of a party whose allegations if established would not entitle it to relief. *See Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989). Here the district court assumed that the appellants could substantiate their allegations that the jury was exposed to the plea proposal information. Therefore a hearing was not needed to develop the facts and the court did not abuse its discretion in not holding one. Of course, under Fed.R.Evid. 606(b) a hearing could not be held for the court to ask the jury the effect of the information on its verdict.

In reaching our result we recognize that sometimes judges are tempted to order hearings to put matters to rest even if not strictly required. After all, a call for a hearing has an inherently reasonable ring to it. But this is not one of those circumstances for there are compelling reasons not to hold a hearing involving the recalling of discharged jurors. As the Court of Appeals for the Second Circuit recently said:

> We are always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

*United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir.1989) (omitting citations).

Indeed, the concerns expressed by the Court of Appeals in *United States v. Ianniello* are hardly new, for the Supreme Court 76 years ago in *McDonald v. Pless* said:

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

238 U.S. at 267–68, 35 S.Ct. at 784.

We cannot lose sight of the fact that we have been forced to recognize that jurors

---

ty was that the defendant, unlike the appellants here, initiated the plea negotiations.

**12.** As in *Greene* the extra-record information in *Dowling* was far more serious than here as it involved, in addition to the conviction, information that the defendant had been charged with attempted armed robbery and murder but acquitted.

are subject to threats and intimidation. Thus, we now in some circumstances approve the use of an anonymous jury, a practice that at one time might have been unthinkable. *See United States v. Scarfo,* 850 F.2d 1015, 1021–26 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). In fact in *Scarfo* we acknowledged that "[j]uror's fears of retaliation from criminal defendants are not hypothetical; such apprehension has been documented." *Id.* at 1023. As the district court said in *United States v. DiNorscio,* 661 F.Supp. at 1042, "it is at least fair to say that disappointed defendants serving lengthy terms of incarceration will quite understandably use every weapon at their disposal to set aside their convictions." We do not doubt that desperate criminals willing to commit violent crimes in the first place would think nothing of attempting to intimidate jurors in an effort to overturn verdicts.[13]

Jurors who complete their service should rarely, if at all, be recalled for proceedings such as those appellants propose here. It is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose. It is useful in this regard to recall the following germane words of the Supreme Court:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.

*Tanner v. United States,* 483 U.S. 107, 120, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987).

## CONCLUSION

The order of February 21, 1991, will be affirmed.

STAPLETON, Circuit Judge, dissenting:

The opinion of the court sets forth accurately and fairly the facts of this matter and I agree with its conclusion that exposure to the full text of the newspaper articles would be very unlikely to prejudice the defendants in the eyes of a juror. There is, however, a problem with the court's analysis. The uncontradicted record evidence indicates that a number of jurors were told that "they offered to settle, but the judge said no because no time would be served" and the record provides no assurance that the jurors exposed to this information read the newspaper articles. I cannot escape the conclusion that an average juror who was exposed only to the "news according to George" would understand that the defendants offered to plead guilty as part of a deal with the government but that the judge refused to go along because the stipulated punishment was too light.[1] This is the kind of understanding that would stay with an average juror and color his or her view throughout even the longest of trials.

Were it true that further development of the record is either precluded or imprudent, I would hold, in accordance with *United States ex rel. Greene v. New Jersey,* 519 F.2d 1356 (3d Cir.1975), that the current record requires a new trial. In my view, however, the sensible and entirely proper thing to do in these circumstances is to hold an evidentiary hearing and determine precisely what, if any, extraneous prejudicial information was brought to the atten-

---

13. We are not implying by this statement that we think that the appellants somewhere improperly approached Rosen or Spraguer. In fact, we do not have the slightest doubt that it was Rosen who made the initial contact exactly as appellants assert and that Spraguer's affidavit was the product of nothing other than her sense of justice on the basis of her law school experience.

1. This court was unable to escape a similar conclusion in *United States ex rel. Greene v. New Jersey,* 519 F.2d 1356 (3d Cir.1975) where members of the jury received information that the defendant had offered to plead *non vult* and we held that the risk of prejudice required a new trial.

tion of members of the jury. It may be that the jurors who heard extraneous information received a fair understanding of what went on at the hearing on the plea agreement and, if so, the conviction should stand. While care would have to be taken to avoid inquiry into "the *effect* of anything upon ... a juror's mind or emotions ... or concerning his mental processes," Fed. R.Evid. 606(b) (emphasis supplied), nothing cited by the court suggests that a post verdict inquiry of the kind I propose would be impermissible or impractical. Indeed, Federal Rule of Evidence 606(b) and its legislative history, as reviewed in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), make clear that such a post verdict hearing is expressly authorized and that a juror could testify at such a hearing concerning any "extraneous prejudicial information ... improperly brought to the jury's attention." Fed. R.Evid. 606(b).

I would remand this case to the district court with instructions to hold an evidentiary hearing consistent with this opinion.