**UNITED STATES of America**

v.

**Leonard A. PELULLO.**

**UNITED STATES of America**

v.

**Leonard A. PELULLO.**

**Crim. A. No. 91–00060.
Civ. A. No. 94–7266.**

United States District Court,
E.D. Pennsylvania.

Aug. 8, 1995.

As Corrected Aug. 11, 1995.

---

Ronald G. Cole, Frank A. Labor, III, Asst. U.S. Attys., Philadelphia, PA, for U.S.

Walter M. Phillips, Jr., Philadelphia, PA, W. Neil Eggleston, Howrey & Simon, Washington, DC, for Leonard A. Pelullo.

### MEMORANDUM

ROBERT F. KELLY, District Judge.

On July 3, 1991, Defendant, Leonard Pelullo, was convicted of 49 counts of wire fraud and one count under the Racketeer Influenced and Corrupt Organization Act ("RICO"). On May 12, 1992, the Third Circuit Court of Appeals reversed Defendant's conviction on all counts except Count 54, which it affirmed, and remanded the case to this Court for re-trial. *United States v. Pelullo*, 964 F.2d 193 (3d Cir.1992). On January 11, 1993 Defendant was retried on 48 wire fraud counts and one RICO count. After a three week trial, the jury convicted Defendant on all counts. The Third Circuit, on January 24, 1994 reversed Defendant's second conviction. *United States v. Pelullo* 14 F.3d 881 (3d Cir.1994). On October 3, 1994 Defendant was retried on the 48 wire fraud counts and one RICO count. The jury failed to reach a verdict, and on October 25, 1994, this Court declared a mistrial. A fourth trial began on January 9, 1995 and resulted in Defendant's being convicted of 46 counts of wire fraud and one count under RICO.

Before the Court are: Defendant's Motion for a New Trial Based on Newly Discovered Evidence of Juror Misconduct; Defendant's Motion Pursuant to 28 U.S.C. § 2255 to Set Aside the Conviction of Count 54 and Dismiss the Indictment; Defendant's Motion for Judgment of Acquittal or For a New Trial; Defendant's Motion for the Production of Rough Notes of All Interviews; Defendant's Motion for the Production of Rough Notes of the Interviews of Arthur and Peter Pelullo, Jr.; and Defendant's Motion to Supplement his Motion on Juror Misconduct. For the reasons that follow, Defendant's Motions will be denied.

### I. *DEFENDANT'S MOTION AS TO JUROR MISCONDUCT*

On March 28, 1995, Defendant filed a Motion for a New Trial or an Evidentiary Hearing based on Newly Discovered Evidence of Juror Misconduct pursuant to Rule 33 of the Federal Rules of Criminal Procedure. In this Motion, Defendant contends that he is entitled to a new trial because Juror 229 [1] did not truthfully answer questions posed by the Court during voir dire. In the alternative, Defendant requests that this Court convene a hearing at which the Juror would testify concerning these matters. According to Defendant, the Juror's alleged failure to truthfully respond during voir dire prejudiced his right to a fair and impartial jury.

In his Motion, Defendant claims to have learned after trial that the brother-in-law of Juror 229, who was ultimately seated on the jury, is James Cattalo, a former police officer for the City of Philadelphia who was convicted of racketeering charges in the "Five Squad" trial. During voir dire, the panel was asked the following questions, to which Juror 229 did not respond: "Is any juror related to or closely associated with anyone employed by any law enforcement agency, including the FBI, local police?"; "Has any juror ever been related to, associated or connected with anyone who was involved in the defense of a criminal case? Whether as a witness, party or as an attorney who defended the matter?"; "Has any juror, relative or close friend ever been charged with a crime in any court, state, local or federal?" "Now, as to this, if any of you feel that you would rather give that response to me in private, you may do so at sidebar, at the end of this

---

**1.** In order to protect the privacy of this juror, she will be referred to as "Juror 229" or "the Juror".

voir dire. Okay, do you understand. The question was, has any juror ever been related to, associated with or connected with anyone or charged with a crime in any court, state, local or federal?" 01/09/95 N.T. at 49–53. Defendant argues that Juror 229 should have responded to these questions, and her failure to do so prejudiced him from exercising his peremptory challenges.

■ In order to succeed on a Rule 33 motion based on juror misconduct, a defendant must show 1) that the evidence is newly discovered, in other words, that it has been discovered since the end of the trial and 2) that the defendant's failure to discover this information during trial is not the result of a lack of diligence. *United States v. Bolinger*, 837 F.2d 436, 438–439 (11th Cir.1988); *United States v. Jones*, 597 F.2d 485, 488 (5th Cir.1979); *United States v. McKinney*, 952 F.2d 333 (9th Cir.1991). "[A] defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a postverdict motion that the verdict was prejudicially influenced by that misconduct." *United States v. Bolinger*, 837 F.2d 436, 438–439 (11th Cir.1988), *quoting*, *United States v. Jones*, 597 F.2d 485, 488 (5th Cir.1979). This rationale is particularly pertinent to the matter at hand, as the Government has presented evidence contradicting Defendant's claim that this is newly discovered evidence.

■ There exists a great reluctance for courts to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias misconduct or extraneous influences." *United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir.1991), *quoting*, *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989). "Jurors who complete their service should rarely, if at all, be recalled for proceedings such as those appellants propose here. [Evidentiary hearing to determine if the jury considered a newspaper account of the case.] It is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose." *Gilsenan*, 949 F.2d at 98.

Such caution is warranted because constant investigation into juror misconduct would "seriously disrupt the finality of the process" by encouraging the losing party to endlessly investigate every juror in the hope of finding some basis for disqualification, and thus a new trial. *Tanner v. United States*, 483 U.S. 107, 120, 107 S.Ct. 2739, 2747–48, 97 L.Ed.2d 90 (1987). The Supreme Court recognized in *Tanner* that, while "postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior, [i]t is not at all clear, however, that the jury system could survive such efforts to perfect it." *Id.*

While bringing a juror in to be questioned may be an easy course for a court to take when confronted with this situation, the above-cited cases make it clear that this is not the first avenue that should be taken. This is especially true when the Government possesses evidence that the claims are not newly discovered, as is true in the matter at hand.

Therefore, by Order dated April 11, 1995, this Court ordered Defendant to file further evidence to support his allegation that this was newly discovered evidence.[2] By Order dated May 12, 1995, this Court found that, based on Defendant's filings, he failed to establish that the evidence was discovered after the conclusion of his trial, and thus scheduled a hearing at which Defendant would be given the opportunity to establish that the evidence concerning Juror 229 was newly discovered. The hearing occurred on June 5, 6, and 15, 1995.

■ Defendant argues that the hearing ordered by the Court was improper because the defense does not have a duty of due diligence. 06/05/95 N.T. at 7–8. For some unknown reason, Defendant interpreted his duty of due diligence as requiring his counsel

---

2. Defendant submitted affidavits from one of his attorneys, Walter Phillips. However, these affidavits were vague concerning the source of this information as well as the timing of the defense team's learning of this information. Moreover, neither Defendant nor his other attorney, Neil Eggleston, submitted an affidavit concerning this matter.

to "go out and conduct an investigation into the background of jurors." *Id.* The law is clear that to be successful on a motion such as that filed by Defendant, it must be established that the failure to discover the evidence at an earlier time must not be the result of a lack of diligence on the defendant's part. *United States v. McKinney,* 952 F.2d 333 (9th Cir.1991); *United States v. Bolinger,* 837 F.2d 436, 438–439 (11th Cir. 1988); *United States v. Jones,* 597 F.2d 485, 488 (5th Cir.1979). Moreover, the duty of due diligence does not require that a defendant or his counsel "conduct an investigation into the background of jurors"[3], but rather it requires a defendant or his counsel to investigate any matters brought to their attention concerning a juror, or at the very least to inform the court when information concerning juror misconduct is learned. *Id.; United States v. Diaz–Albertini,* 772 F.2d 654, 657 (10th Cir.1985).

Furthermore, the hearing was held in order to give Defendant yet another opportunity to present evidence that the information concerning Juror 229 was indeed newly discovered evidence. 06/05/95 N.T. at 7–9. The only evidence previously presented to the Court pertaining to this matter were the affidavits of Mr. Phillips, which were vague and only stated the general conclusion that counsel for Defendant did not learn of this information during trial. This evidence was insufficient for this Court to find that this information was newly discovered. The affidavits neither revealed the source of knowledge concerning the claims about Juror 229, nor stated the factual circumstances under which the source learned of this information. Moreover, the affidavits did not disclose the manner in which the information was revealed to the "defense team." In fact, Defendant's Motion did not even contain an affidavit from the source of the information, Defendant himself, or his other attorney concerning how and when this knowledge about

Juror 229 was obtained. As such, a hearing was necessary to allow Defendant to show that the evidence was newly discovered and that the "defense team" acted with due diligence.

Defendant's final argument against holding the hearing is that under 28 U.S.C. § 1865(b), a person may not serve as a juror if he/she has been convicted of a crime punishable by more than one year in prison. Defendant is of the belief that the Juror was convicted of such a crime, and therefore, the Juror was automatically disqualified from serving, thus entitling Defendant to a new trial. 06/15/95 N.T. at 92–97. However, the cases addressing 28 U.S.C. § 1865 hold that the granting of a new trial is not automatic, but that actual bias or prejudice be shown. *Ford v. United States,* 201 F.2d 300 (5th Cir.1953); *United States v. Humphreys,* 982 F.2d 254, 260–62 (8th Cir.1992); *United States v. Boney,* 977 F.2d 624 (D.C.Cir.1992). Therefore, this Court rejects Defendant's argument with respect to § 1865(b).

In order to properly analyze and weigh the testimony concerning whether this was newly discovered evidence, the Court will first summarize the testimony presented by the defense, and then make its findings of fact.

### A. *THE DEFENSE TESTIMONY*

1. The source of the knowledge concerning Juror 229 was Patricia Mitchell, an employee of Defendant's father's wholesale food store, Montco Cash and Carry.[4] Phillips Third Affidavit; 06/05/95 N.T. at 147–148. Ms. Mitchell has been employed at Montco Cash and Carry since November, 1994. *Id.* at 148. Montco Cash and Carry is a wholesale food store where local grocers purchase their groceries to sell in their stores. *Id.*

2. Ms. Mitchell testified that on the morning of Friday, February 3, 1995,[5] she was standing in line at Montco Cash and

---

3. 06/05/95 N.T. at 7–8.

4. Ms. Mitchell was not called to testify by Defendant, but rather was called by the Government. However, her testimony is summarized with the other defense witnesses because she was called on cross-examination. 06/05/95 N.T. at 143.

5. Ms. Mitchell testified that the conversation occurred on the Friday before the big and only snowstorm of 1995. This Court takes judicial notice that the snowstorm started late in the evening of February 3, 1995 and continued into Saturday February 4, 1995.

Carry in order to cash her check. 06/05/95 N.T. at 156. While in line, Ms. Mitchell claims to have overheard a man named "Squiggles" [6] tell the cashiers that a girl whose sister had been murdered was on Defendant's jury. *Id.* Ms. Mitchell testified that "Squiggles" stated the juror's first name and also stated that this juror was the sister of Donna Willard. *Id.* at 158. At this point, Ms. Mitchell realized that the juror described by "Squiggles" was an acquaintance of hers, and that the juror had a brother-in-law, James Cattalo, who was convicted in the Five Squad trial. *Id.* at 158–159. This juror was Juror 229.

3. Ms. Mitchell testified that she was "curious as to how she [Juror 229] could be on a jury." *Id.* at 166. Ms. Mitchell got the idea from television shows that having a sister who was murdered and a convicted brother-in-law disqualifies a person from serving as a juror. *Id.* at 167. Ms. Mitchell testified that she did not inform anyone other than her husband of this information until sometime between mid-February and mid-March. *Id.* at 190–196.

4. Ms. Mitchell further testified that on Sunday evening, February 5, 1995, two days after allegedly overhearing "Squiggles'" conversation, she was going to visit her father who lives in Delaware County. *Id.* at 170–173, 181–182. As she was driving to her father's house her car happened to get stuck in the snow about one block from the Juror's house. *Id.* at 172–173. Because her car was stranded near the Juror's house, Ms. Mitchell went over to the Juror's house and visited with her. *Id.* at 174. Prior to this visit, Ms. Mitchell had not seen Juror 229 in the last six months to one year. *Id.* at 203.

5. Ms. Mitchell testified that Juror 229's husband and some neighborhood kids were also at Juror 229's house, along with a neighbor who stopped over for a short period of time. *Id.* at 179. Ms. Mitchell testified that she did not meet this neighbor. 06/06/95 N.T. at 87–88. However, Ms. Mitchell later testified that the Juror's husband was not present on that evening. 06/06/95 N.T. at 84–85.

6. According to Ms. Mitchell, during the conversation the Juror revealed that she had served on Defendant's jury. 06/05/95 N.T. at 175. Ms. Mitchell admits that she did not then inform the Juror that she worked for Defendant's father. *Id.* at 174–175. However, later in the conversation, Ms. Mitchell did disclose this fact. *Id.* Ms. Mitchell also informed the Juror that she saw the Juror entering the courthouse one day during the trial, and was therefore aware of the Juror's service on Defendant's jury prior to this visit. *Id.* at 175, 182–183. However, later in the conversation, Ms. Mitchell changed her story and informed the Juror that she did not see the Juror at the courthouse, but rather learned about her jury service from James Grimes. *Id.* at 182–183. Ms. Mitchell explained that she initially lied to the Juror because she did not want to cause any friction between the Juror and Mr. Grimes. *Id.*

7. Ms. Mitchell also asked the Juror how she could serve on a jury given her family's involvement with the criminal system in the forms of Donna Willard and James Cattalo. *Id.* at 174–178. According to Ms. Mitchell, the Juror informed her that she wanted to be on the jury because "federal juries paid good." *Id.* at 213. Ms. Mitchell also testified that Juror 229 told her during the conversation that she smoked a joint before trial every day. *Id.* at 187–188. As to Ms. Mitchell's drug use, she claims that she does not use drugs. *Id.* at 160.

8. Ms. Mitchell further testified that she was at the Juror's house on one occasion subsequent to her February 5th visit. *Id.* at 202–203. According to Ms. Mitchell, about one month after the trial concluded she stopped by the Juror's house, but no one was home. *Id.* at 202. Ms. Mitchell testified that she left a note on the Juror's door that read as follows: "[The Juror's First Name]: It's important. Call me. Lorraine's friend, Patty", along with a telephone number. *Id.* at 202–203, 214. Ms. Mitchell claims that she left the note because an individual in her neighborhood was starting a new job and needed a baby sitter. *Id.* at 214. Ms. Mitchell thought that the Juror would be interested in taking care of her friend's child. *Id.*

6. "Squiggles" real name is James Grimes.

9. Despite the new found information that the Juror had a sister who was the victim of a violent crime, smoked marijuana every day prior to trial and had a brother-in-law who was convicted of a crime, Ms. Mitchell did not disclose this information to Defendant's father. *Id.* at 190. Ms. Mitchell is not sure whether she ever disclosed this information to Defendant's father. *Id.* at 192–194. In fact, Ms. Mitchell is not very sure when or to whom she disclosed this information about the Juror. *Id.* at 190–196. All Ms. Mitchell remembers is that she revealed this information to Neil Eggleston, one of Defendant's attorneys, sometime between mid-February and mid-March. *Id.* at 191–194, 215. Ms. Mitchell claims that she found Mr. Eggleston's name in the Rolodex at work and decided to call him without being instructed to do so by anyone. *Id.* at 195–196.

10. However, Ms. Mitchell also testified that in February she informed Defendant's father that she knew the Juror. *Id.* at 193. According to Ms. Mitchell, Peter Pelullo, Sr. instructed her to call Mr. Eggleston with this information. *Id.*

11. Ms. Mitchell also testified that in her phone call to Mr. Eggleston, she only revealed to him that she knew the Juror, that the Juror's sister was murdered and that the Juror smoked pot. *Id.* at 205–206. Ms. Mitchell claims that she did not reveal to Mr. Eggleston the Juror's relationship to James Cattalo on this occasion. *Id.* at 206, 215.

12. Ms. Mitchell further testified that she attempted to contact Mr. Eggleston again in early March, but was unsuccessful in doing so because he was on vacation. *Id.* at 215–216. Subsequent to Mr. Eggleston's return from vacation, Ms. Mitchell testified that she spoke with Mr. Eggleston in person at the office of Peter Pelullo, Sr. in mid-March and informed him for the first time about Juror 229's relationship to James Cattalo. *Id.* at 216–217.

13. Peter Pelullo, Sr. is Defendant's father. 06/06/95 at 55. Peter Pelullo, Sr. was called to testify by the defense at the hearing. *Id.* Peter Pelullo, Sr. testified that Ms. Mitchell informed him in the middle of February that she knew the Juror, and that Squiggles' Deli was located in the same neighborhood in which the Juror lived. *Id.* at 56–57. According to Peter Pelullo, Sr., this was the extent of the information that Ms. Mitchell revealed at that time. *Id.* at 67.

14. Peter Pelullo, Sr. also testified that, near the end of February, he had a conversation with Mr. Grimes at Montco Cash and Carry pertaining to the Juror. *Id.* Peter Pelullo, Sr. testified that he asked Mr. Grimes if he knew the Juror, and that Mr. Grimes stated that he did know the Juror. *Id.* at 58. Peter Pelullo, Sr. claims that Mr. Grimes then told him that "she should not have been on that jury." *Id.* Peter Pelullo, Sr. also testified that Mr. Grimes informed him that the Juror was a drug addict. *Id.*

15. Peter Pelullo, Sr. testified that he called Mr. Eggleston and relayed the information that was provided by Mr. Grimes. *Id.* at 58–59. When asked whether the name James Cattalo was raised during this conversation, Peter Pelullo, Sr. testified that Cattalo's name was not mentioned in his conversation with Mr. Grimes. *Id.* Peter Pelullo, Sr. testified that the first time he heard about James Cattalo's connection to the Juror was when Mr. Eggleston called for Ms. Mitchell near the end of March. *Id.* at 59.

16. Peter Pelullo, Sr. further testified that he received a visit from Mr. Grimes in April because Mr. Grimes was upset that he was served with a subpoena to appear before a grand jury about this matter. *Id.* at 63–64. A motion to quash the subpoena was later filed by one of Defendant's attorneys. *Id.* at 75–79.

17. At the hearing, Neil Eggleston testified for the defense. 06/05/95 N.T. at 76. Mr. Eggleston served as co-counsel to Defendant during the third and fourth trials of this matter. *Id.* at 76. On direct examination, Mr. Eggleston testified in a conclusory fashion that, during the trial, he did not have any information that Juror 229 was related to an individual who was convicted of a crime. *Id.* at 76–77.

18. On cross-examination, Mr. Eggleston testified that in February he had a conversation with Peter Pelullo, Sr. wherein Peter Pelullo Sr. told Mr. Eggleston that he heard

rumors in the neighborhood that the Juror was a heavy-duty drug user. *Id.* at 110–113.

19. Mr. Eggleston further testified that on March 7, 1995, he spoke with Ms. Mitchell at the office of Defendant's brother, *Peter Pelullo, Jr. Id.* at 85–87. Mr. Eggleston testified that on this occasion he learned for the first time that Ms. Mitchell knew the Juror. *Id.* at 85–91. Mr. Eggleston testified that the Juror's relation to James Cattalo was not raised at this meeting. *Id.* at 88–89. Mr. Eggleston further testified that he may have, but does not know whether he spoke with Ms. Mitchell prior to this meeting. *Id.* at 86–91.

20. Mr. Eggleston also testified that on March 23, 1995, he met with Ms. Mitchell for a second time, but that this second meeting occurred at the offices of Defendant's father, *Peter Pelullo, Sr. Id.* at 85. According to Mr. Eggleston, it was at this meeting that he learned for the first time that the Juror was related to James Cattalo. *Id.* at 84–85, 88–89.

21. As a result of this conversation with Ms. Mitchell, Mr. Eggleston asked her to go to the library to get some of the articles pertaining to the Five Squad trial. 06/06/95 N.T. at 89–90. Mr. Eggleston testified that he received a fax of the articles that he requested on March 25, 1995. *Id.* at 90; Defense Exhibit 1.

22. Walter Phillips also testified for Defendant. 06/05/95 at 10. Mr. Phillips served as co-counsel for Defendant in this trial. *Id.* at 10–11. On direct examination, Mr. Phillips testified, in conclusory fashion, that he did not have any knowledge during trial that the Juror had not been truthful in answering questions during voir dire. *Id.*

23. On cross-examination, Mr. Phillips testified that he filed a motion to quash Mr. Grimes' subpoena to appear before the grand jury. 06/15/95 N.T. at 73. According to Mr. Phillips, after the motion was denied, he had a conversation with someone at Peter Pelullo, Sr.'s office and instructed them to inform Mr. Grimes that he had to appear in front of the grand jury the following day. 06/15/95 N.T. at 74–78. He believes the individual he spoke with was Ms. Mitchell. *Id.*

24. On April 24, 1995, Ms. Mitchell visited Mr. Grimes at his store. 06/05/95 N.T. at 162–166. Ms. Mitchell testified that she stopped by to make sure that Mr. Grimes was not going to lie in front of the grand jury, because she claims that, based on rumors she has heard in the neighborhood, he is a liar. *Id.* at 163–164. However, Ms. Mitchell claims that she did not have a conversation with Mr. Grimes on this occasion because the store was crowded when she arrived. *Id.* at 164–166.

25. Defendant also testified at the hearing. 06/05/95 at 39. Similar to his counsel's testimony, he testified on direct examination that he did not have any knowledge during trial that the Juror had not been truthful in answering questions during voir dire. *Id.* at 40.

26. On cross-examination, Defendant was questioned as to whether he instructed his girlfriend, Lynn Merritt, to order the transcript of the trial. *Id.* at 45, 48. Defendant was also questioned as to whether he instructed her to order the voir dire on an expedited basis. *Id.* Defendant responded as follows: "I might have done that. I'm not saying I didn't. I just don't remember. I could have done it." *Id.* at 49.

27. Defendant also testified that he learned for the first time in March that an employee of his father knew the Juror. *Id.* at 64. Defendant testified that he learned this information from his father. *Id.* at 65, 69. Defendant testified that he told his father to inform his attorneys of this, but "keep me out of it". *Id.* at 70–72. Upon further questioning, Defendant testified that his father also informed him at that time that the Juror was a "heavy-duty drug user". *Id.* at 73.

28. On July 27, 1995, Defendant submitted an affidavit of Lynn Merritt. Merritt Affidavit. In her Affidavit, Ms. Merritt claims that, subsequent to the trial, Mr. Eggleston instructed her to order a copy of the argument that occurred prior to the voir dire on January 9, 1995. *Id.* at ¶ 5. Ms. Merritt states that "I know that I did not specifically request 'just the voir dire'" from the transcription service. *Id.* Ms. Merritt further

stated that she recalled that "jury selection was not completed by the end of the first day and that a certain amount of time was devoted on January 10, 1995 to complete the selection of a jury. Neither Mr. Pelullo, Mr. Eggleston nor anyone else connected with the defense team requested that I order the transcript of January 10, 1995 concerning jury selection that day, and I did not order it." *Id.*

## B. *FINDINGS OF FACT*

Based on all of the material submitted to this Court, the arguments made by both parties, and the testimony presented by both parties, this Court makes the following Findings of Fact:

1. The voir dire in this matter began on January 9, 1995. 01/09/95 N.T. at 41. The questioning of the jury panel concluded on January 9, 1995, and the only matter remaining for January 10, 1995 was for counsel to exercise their peremptory challenges. 01/09/95 N.T. at 161.

2. During the voir dire, Juror 229 disclosed that her sister had been murdered in 1990. 01/09/95 N.T. at 56–57. The Juror indicated that neither this, nor anything else would affect her ability to be a fair and impartial juror. *Id.* at 56–57, 74–75. Follow-up questioning of Juror 229 was not requested by either party.

3. On January 10, 1995, Juror 229 was seated as an alternate juror. On January 11, 1995, Juror 229 was seated as a petit juror. 01/11/95 at 2–16.

4. On January 18, 1995, this Court disclosed in open court that it learned that Juror 229 was the sister of Donna Willard, the victim of a locally well-known murder.[7] 01/18/95 N.T. at 2–3. This Court held a conference with the parties. *Id.* Neither party objected to her continuing to serve as a juror, nor did either party request that she be questioned about this matter. *Id.*

5. Defendant was convicted on January 27, 1995. 01/27/95 N.T.

6. Defendant filed the instant Motion on March 28, 1995. Defendant's Motion failed to inform the Court as to how or when Defendant or his attorneys became aware of the allegations pertaining to the Juror. Moreover, the Motion failed to identify the source of the information. Therefore, by Order dated April 11, 1995, this Court ordered Defendant to file further evidence in support of his allegation that the information pertaining to Juror 229 was discovered after the trial. Between March 30, 1995 and April 21, 1995, Mr. Phillips filed four affidavits. Each affidavit was vague and revealed little information to aid this Court in reaching a decision on this matter.

7. By Order dated May 12, 1995, this Court found Defendant's Motion and supporting material insufficient to establish that the information concerning the Juror was newly discovered. Therefore, this Court scheduled a hearing wherein Defendant would be given the opportunity to show the Court that this was newly discovered evidence.

8. This Court heard testimony on this Motion on June 5, 6, and 15, 1995.

### 1. *The Meeting With "Squiggles"*

9. James Grimes testified at the hearing. 06/05/95 N.T. at 219. Mr. Grimes is the proprietor of Squiggles' Deli, which is located in southwest Philadelphia. 06/05/95 N.T. at 219–220. Squiggles' Deli is located in the same neighborhood in which Juror 229 lives. *Id.* at 219–220, 223. Mr. Grimes testified that he went to Montco Cash and Carry several times per week to purchase groceries for his deli. *Id.* at 219, 241. Mr. Grimes is the individual that Ms. Mitchell knew as "Squiggles", and from whom she claims to have learned that Juror 229 was on Defendant's jury. 06/05/95 N.T. at 160; Defendant's Testimony at ¶¶ 1, 2. ("Deft's Test.").

10. Mr. Grimes testified that in mid-January, 1995, he was shopping at Montco Cash and Carry and was approached by Defendant's father, Peter Pelullo, Sr.. 06/05/95 N.T. at 219–221. Peter Pelullo, Sr. asked

---

7. During voir dire, the Juror did inform the Court that she had a sister who was the victim of a murder. However, the name of the Juror's murdered sister was not known during the voir dire.

Mr. Grimes if the two of them could walk around the store to talk, and Mr. Grimes agreed. *Id.* at 221–222. During this conversation, Peter Pelullo, Sr. stated the Juror's name and asked Mr. Grimes if he knew this individual. *Id.* at 223. Mr. Grimes testified that he informed Peter Pelullo, Sr. that he did not know this person that he named. *Id.* at 222–224; *Contra* Deft's Test at ¶ 14.[8] According to Mr. Grimes, Peter Pelullo, Sr. then informed him that this person was the sister of Donna Willard. 06/05/95 N.T. at 223–224; 06/06/95 N.T. at 18–19, *Contra* Deft's Test at ¶ 14. Only when the relationship with Donna Willard was disclosed did Mr. Grimes recognize that the individual about whom Peter Pelullo, Sr. was speaking was a customer of his store. 06/05/95 N.T. at 223–224, 06/06/95 N.T. at 18–19; *Contra* Deft's Test at ¶ 14.

11. Mr. Grimes further testified that Peter Pelullo, Sr. revealed that the Juror was on Defendant's jury. 06/05/95 N.T. at 224–226; *Contra* Deft's Test at ¶ 14, 2. Mr. Grimes testified that he never told Peter Pelullo, Sr. that the Juror "should not have been on that jury" or that the Juror was a "heavy-duty drug user". 06/05/95 N.T. at 224–226, 252; *Contra* Deft's Test at ¶ 14. According to Mr. Grimes, Peter Pelullo, Sr. provided him with the information that the Juror had a brother, George, and a brother-in-law, James Cattalo. 06/05/95 N.T. at 225–227; *Contra* Deft's Test at ¶ 15. In fact, Mr. Grimes testified that Peter Pelullo, Sr. asked him if he knew anything about the Juror, her brother George or James Cattalo, such as whether they did drugs. 06/05/95 N.T. at 225–227, 06/06/95 N.T. at 21; *Contra* Deft's Test at ¶ 15. Mr. Grimes responded to these inquiries by informing Peter Pelullo, Sr. that what these people did was "[n]one of my business." 06/05/95 N.T. at 227–228; *Contra* Deft's Test at ¶¶ 14, 15.

12. Mr. Grimes testified that his best recollection is that this conversation with Peter Pelullo, Sr. occurred two to four weeks prior to the February 4, 1995 snowstorm, not the end of February as Peter Pelullo, Sr. testified. 06/05/95 N.T. at 221–222; *Contra* Deft's Test at ¶ 14. During cross-examination, Mr. Grimes maintained that the conversation definitely occurred prior to the snowstorm of February 4th. 06/05/95 N.T. at 250–251; 06/06/95 N.T. at 31–32; *Contra* Deft's Test at ¶ 14.

13. During his testimony, Mr. Grimes insisted that he did not have a conversation with a check-out clerk at Montco Cash and Carry concerning a juror on Defendant's jury. 06/05/95 N.T. at 229–231, 06/06/95 N.T. at 16; *Contra* Deft's Test at ¶ 2. This contradicts Ms. Mitchell's testimony as to the manner in which she learned of the Juror's service on Defendant's jury. Deft's Test. at ¶ 2. Mr. Grimes vehemently insisted that he did not approach anyone at Montco Cash and Carry concerning the Juror. 06/06/95 N.T. at 15–17; *Contra* Deft's Test at ¶ 2. In fact, Mr. Grimes testified that he feels that he should not even be involved in this matter, but that "[t]hey (the people at Montco) involved me in this." 06/06/95 N.T. at 16–17.

14. This Court credits the testimony of Mr. Grimes and finds: that the conversation with Peter Pelullo, Sr. occurred in mid-January, during Defendant's trial; that Mr. Grimes did not know the Juror until Peter Pelullo, Sr. revealed that she was the sister of Donna Willard; that Peter Pelullo, Sr. knew during his conversation with Mr. Grimes of the relationship between the Juror and James Cattalo, and that it was Peter Pelullo, Sr. who revealed the existence of this relationship to Mr. Grimes; that Peter Pelullo, Sr. quizzed Mr. Grimes about his knowledge of the Juror, the Juror's brother George and James Cattalo; that Mr. Grimes refused to provide any information to Peter Pelullo, Sr. concerning these individuals; that Mr. Grimes never had a conversation with the checkout clerks at Montco Cash and Carry concerning the Juror; and that Ms. Mitchell did not learn of the Juror's service on Defendant's jury by overhearing a conversation between Mr. Grimes and a checkout clerk at Montco Cash and Carry.

### 2. *The Note*

15. Lorraine D'Angelo also testified at the hearing. 06/15/95 N.T. at 2. Ms. D'Angelo is a friend of both Ms. Mitchell and the

---

**8.** *Contra* is used to denote where the testimony contradicts other testimony that was presented.

Juror. *Id.* at 3. Ms. D'Angelo testified that in the middle of January, 1995, she received a phone call from Ms. Mitchell. *Id.* at 3–4. Prior to this phone call, Ms. D'Angelo had not heard from Ms. Mitchell for at least two years. *Id.* at 4. During the course of the conversation, Ms. Mitchell stated that she had seen Juror 229 on Woodland Avenue about one week earlier, and that Ms. Mitchell had beeped and waived to the Juror, but the Juror did not appear to recognize her. *Id.* at 5–6. Ms. Mitchell also asked Ms. D'Angelo whether the Juror still smokes marijuana. *Id.* at 6.

16. Ms. D'Angelo consistently testified that this phone call came "about two, two and a half weeks" after the first of the year. *Id.* at 4, 16, 20. In fact, on cross-examination, Ms. D'Angelo testified that she was "absolutely certain" that this first call occurred in January 1995. *Id.* at 16.

17. Approximately one week to ten days after the first call, Ms. D'Angelo received another call from Ms. Mitchell, this time at her place of employment. *Id.* at 6–7. Ms. D'Angelo works as a waitress and bartender on the week-ends and testified that this second call occurred on a Friday night. *Id.* at 13. Ms. D'Angelo testified that she rarely receives personal calls at work because she is so busy, and was quite annoyed that Ms. Mitchell had called her at work. *Id.* at 7, 20–21. This very brief conversation consisted of Ms. Mitchell's asking Ms. D'Angelo if the Juror "still lived at the same place." *Id.* at 7–8, 20–21. Ms. D'Angelo responded "Yeah, the house on Upland Street", and while she did not know the address, Ms. D'Angelo described the Juror's house to Ms. Mitchell. *Id.*

18. This Court finds that this second phone call was made for the sole purpose of verifying where Juror 229 lived. *Id.* at 8. This Court also finds that this second call occurred in the month of January. Ms. D'Angelo testified that this second call occurred one week to 10 days after the first call. *Id.* at 6–7. On cross examination, Ms. D'Angelo testified as follows concerning the second phone call:

Q. Is it possible that it took place in February?

A. Anything's possible.

Q. Is it possible that that phone call took place in March?

A. No.

Q. But it could have taken place in February?

A. I doubt it.

Q. You doubt that the second call took place in February?

A. I doubt it.

Q. Well, if the first call took place sometime possibly between the second and third week or even—or in the third week of January, then the second call that came a week to ten days later could have come in February, could it not?

A. I doubt it, I think it was before the month was out.

Q. You're certain that both the phone calls came before the month was out?

A. I'm not positive, no, but I'm almost certain.

06/15/N.T. at 22.

19. James Donahue also testified at the hearing. 06/05/95 at 271. Mr. Donahue and the Juror were married, but are now separated. *Id.* at 272. Mr. Donahue testified that one week to 10 days after the start of Defendant's trial, he found a note taped to the door of the Juror's house. *Id.* at 273, 278; *Contra* Deft's Test at ¶ 8. The note read: "[The Juror's First Name]: It's important. You call me. Lorraine's friend Patty" along with a telephone number. *Id.* at 202, 274. The Juror did not immediately know who Patty was, but spoke with Lorraine D'Angelo and learned that the Patty referred to in the note was Ms. Mitchell. *Id.* at 275.

20. John Micofsky also testified at the hearing. 06/15/95 N.T. at 46. Mr. Micofsky lives in the same neighborhood as the Juror and visits the Juror a few times per week. *Id.* at 47. Mr. Micofsky testified that in the second week of January 1995 he learned that the Juror was on jury duty. *Id.* at 47–48. Mr. Micofsky testified that about two weeks after the Juror began her jury duty, he had a conversation with the Juror concerning the note that was taped to her door. *Id.* at 48–49; *Contra* Deft's Test at ¶ 8.

21. While Ms. Mitchell admits that she did leave this note taped to the Juror's door, she contends that she left it about one month after the conclusion of Defendant's trial, not during the month of January. Deft's Test. at ¶ 8. However, this Court credits the testimony of Mr. Donahue and Mr. Micofsky and finds that Ms. Mitchell left this note during Defendant's trial in January. This Court further finds that Ms. Mitchell called Ms. D'Angelo on two occasions in January. The second call was made in order for Ms. Mitchell to verify the Juror's address due to the fact that she did not receive a response from the note that she had earlier left taped to the Juror's door.

### 3. Ms. Mitchell's Visit to the Juror's House

22. Mr. Donahue and Mr. Micofsky also testified that shortly after the conclusion of Defendant's trial, Ms. Mitchell visited the Juror at the Juror's house. 06/05/95 N.T. at 277; 06/15/95 N.T. at 51, 66. The Juror was home on this occasion along with Mr. Donahue and Mr. Micofsky. 06/05/95 N.T. at 275–276; 06/15/95 N.T. at 51–53. Mr. Donahue and Mr. Micofsky testified that Ms. Mitchell asked them if they knew where she could get some marijuana. 06/05/95 N.T. at 277–278, 06/15/95 N.T. at 57–58. Both the Juror and Mr. Donahue responded in the negative, but Mr. Micofsky volunteered that he could get Ms. Mitchell some marijuana. 06/05/95 N.T. at 278; 06/15/95 N.T. at 57–58. Ms. Mitchell gave Mr. Micofsky $5, and Mr. Micofsky left the Juror's house to get some marijuana for Ms. Mitchell. 06/15/95 N.T. at 57–58. Mr. Micofsky testified that when he returned, Ms. Mitchell, the Juror and he smoked the marijuana. Id. at 57–58; Contra Deft's Test at ¶ 7.

23. According to Mr. Micofsky, the visit by Ms. Mitchell occurred prior to the February 4th snowstorm, and he is absolutely certain that it occurred in January, 1995. 06/15/95 N.T. at 51, 66; Contra Deft's Test at ¶ 4. According to Mr. Micofsky, there was no snow on the ground the evening that Ms. Mitchell visited the Juror. Id.; Contra Deft's Test at ¶ 4.

24. Mr. Micofsky and Mr. Donahue also testified that during this visit, Ms. Mitchell stated that she saw the Juror at the courthouse and yelled to her, but the Juror did not hear her. 06/05/95 N.T. at 279; 06/15/95 N.T. at 56. Mr. Donahue was in the house the entire two hours that Ms. Mitchell visited with the Juror, but was in the presence of the Juror and Ms. Mitchell for approximately one hour during the visit. 06/05/95 N.T. at 280–281; 06/15/95 N.T. at 52–53; Contra Deft's Test at ¶ 5.

25. Dawn Smalley also testified at the hearing. 06/15/95 N.T. at 26. Ms. Smalley lived across the street from the Juror until April, 1995, and used to go over to the Juror's house every day. 06/15/95 at 27–28, 38. Ms. Smalley was at the Juror's house for approximately 15 minutes the evening that Ms. Mitchell paid a visit to the Juror. Id. at 29, 30, 36. Ms. Smalley testified that she was introduced to Ms. Mitchell on that occasion. Id. at 30, 33–34; Contra Deft's Test at ¶ 5. Ms. Smalley testified that Mr. Donahue was also present on this occasion. Id. at 30, 33–34; Contra Deft's Test at ¶ 5. Ms. Smalley further testified that there was no snow on the ground the night that Ms. Mitchell visited the Juror. Id. at 31; Contra Deft's Test at ¶ 4.

26. On Tuesday or Wednesday of the week following Ms. Mitchell's second phone call to Ms. D'Angelo, Ms. D'Angelo went to visit Juror 229. Id. at 8, 23. Ms. D'Angelo testified that the visit occurred shortly after the end of Defendant's trial because Juror 229 was visibly upset by the trial. Id. 8–9, 24–25. During this visit, the Juror informed Ms. D'Angelo that she had received a visit from Ms. Mitchell "the other day" and that the visit was upsetting to the Juror. Id. at 13; Contra Deft's Test at ¶ 4.

27. This Court finds: that this visit did not occur on February 5, 1995, but rather it occurred prior to the February 4th snowstorm; that Mr. Donahue was present during a portion of Ms. Mitchell's visit; that Ms. Smalley was at the Juror's house for a short period of time and was introduced to Ms. Mitchell; that Mr. Micofsky purchased marijuana at the request of Ms. Mitchell, who claims that she does not do drugs, and smoked the marijuana with Ms. Mitchell and the Juror.

#### 4. *The Grand Jury Subpoena*

28. On approximately April 21, 1995, Mr. Grimes was interviewed by the FBI concerning this matter. 06/05/95 N.T. at 233. After Mr. Grimes was interviewed, he was served with a subpoena to appear before a grand jury. *Id.* at 236–237. The next day, Mr. Grimes went to Montco Cash and Carry to see Peter Pelullo, Sr., who offered to hire a lawyer for him. *Id.* Mr. Grimes further testified that Peter Pelullo, Sr. informed him that arrangements would be made to have a motion filed so he would not have to appear in front of the grand jury. *Id.* at 238; *Contra* Deft's Test at ¶ 16.

29. A motion to quash a grand jury subpoena was filed by Defendant's attorney, Walter Phillips. 06/15/95 N.T. at 78–79. Since Mr. Grimes does not have a telephone at his delicatessen, Peter Pelullo, Sr. sent Ms. Mitchell to inform Mr. Grimes that the motion to quash the grand jury subpoena was denied and that Mr. Grimes had to appear before the grand jury the following day. 06/05/95 N.T. at 232–233, 238–241; *Contra* Deft's Test at ¶ 23, 24. Mr. Grimes testified that no one was present at his store when Ms. Mitchell arrived, and that she told Mr. Grimes that he had to go to court the next day. *Id.* at 238–241; *Contra* Deft's Test at ¶ 24. Ms. Mitchell then gave Mr. Grimes the "thumbs up" sign. *Id.*

30. This Court credits the testimony of Mr. Grimes on this matter and finds that: Mr. Grimes was served with a subpoena and went to Montco Cash and Carry to complain about his involvement in this matter; Peter Pelullo, Sr. arranged for Mr. Phillips to file a motion to quash Mr. Grimes' grand jury subpoena; the motion was denied and Mr. Phillips called Montco Cash and Carry and informed Ms. Mitchell that the motion was denied; Ms. Mitchell went to inform Mr. Grimes that he had to appear before the grand jury; and that Ms. Mitchell did actually have a conversation with Mr. Grimes that evening.

#### 5. *Ordering the Transcript*

31. Geraldine Laws runs a transcription service for federal court. 06/06/95 N.T. at 33. Ms. Laws testified that a "few days" after the conclusion of the trial, Lynn Merritt telephoned Ms. Laws to order a copy of the transcript. *Id.* at 33–34. Ms. Laws called Ms. Merritt back on Ms. Merritt's pager and inquired whether she also wanted to order the voir dire. *Id.* at 35–36. Ms. Merritt told Ms. Laws that she would have to call Ms. Laws back with an answer to that question. *Id.* Ms. Merritt called back and said that she wanted the remainder of the trial on a regular 30 day basis, but that "they wanted just the voir dire on an expedited basis." *Id.* at 36–38, 47–49; *Contra* Deft's Test at ¶ 28. Ms. Laws testified that it was unusual for a party to order the transcript of the voir dire. 06/06/95 N.T. at 49.

32. This Court credits the testimony of Ms. Laws and finds: that Ms. Merritt was instructed to order the transcripts, and that she ordered only the voir dire on an expedited basis, while the remainder of the trial was ordered on a regular basis; that the only plausible explanation for ordering the voir dire on an expedited basis immediately after trial is because Defendant was aware of this information concerning Juror 229 during trial; that Defendant's explanation for ordering the voir dire on an expedited basis—that it was needed to prepare for post-trial motions—cannot be credited because the post-trial motion was filed on February 2, 1995 and the voir dire was not delivered until February 10, 1995; and that the defense testimony was vague on this matter and cannot be credited.

#### 6. *The "Defense Team" Possessed This Information About the Juror During the Trial*

33. This Court finds that at the very least, Defendant had knowledge of this information about the Juror during trial. Defendant has exerted control over virtually every aspect of his case. This Court has observed Defendant's conduct during the trials in this matter. Defendant has argued on his own behalf on several occasions, instructed his attorneys to ask questions of witnesses during both direct and cross examination, and appeared to take copious notes throughout these proceedings. In fact, on one occasion, Defendant informed the Court that he "play[s] a very active role in the preparation

and defense" of his case. GX–1 at 1. Given the control Defendant exerted over his defense, the fact that Ms. Mitchell and Peter Pelullo, Sr. were aware during the trial of the information pertaining to Juror 229, this Court finds that at the very least, Defendant was aware of this information during trial and chose to remain silent on this matter rather than bring it to the Court's attention.

34. This Court further finds that it is inconceivable that Peter Pelullo, Sr., did not convey this information about the Juror to Defendant as soon as it became known to him. Defendant and Peter Pelullo, Sr. have a close relationship. In fact, a portion of the defense during the trials was that Peter Pelullo, Sr. donated millions of dollars worth of material and labor to his son for the renovations on the Art Deco Hotels because of their close relationship. Moreover, Peter Pelullo, Sr. has testified for Defendant at all four trials, and even testified that he would lie to help his son. 01/24/95 N.T. at 90. Also, Peter Pelullo, Sr. frequently speaks to Defendant's attorneys about his case. 06/05/95 N.T. at 72, 109–110, 114, 116, 233–234.

35. This Court also finds that it is not credible that Defendant, upon learning about the Juror from his father, instructed his father to talk to his attorneys and to keep him out of this matter. *Id.* at 71–74. Given Defendant's control over this case, this Court cannot credit Defendant's testimony that he did not want to get involved in this matter.

36. Moreover, the defense testimony concerning the ordering of the voir dire on an expedited basis is not credible. Ms. Merritt, Defendant's girlfriend has a motive to lie. Moreover, she claims that it was Mr. Eggleston who instructed her to order the voir dire on an expedited basis. However, Defendant testified that he may have instructed her to order the voir dire on an expedited basis. Furthermore, the only basis for ordering the voir dire on an expedited basis was because Defendant had knowledge about the Juror during the trial. Defendant's proffered reasons for ordering only the voir dire on this basis are baseless.

### 7. *Defendant Has Not Shown That the Evidence Is Newly Discovered*

37. Defendant has failed to prove that this evidence was discovered after the trial. As detailed above, Peter Pelullo, Sr.'s and Ms. Mitchell's knowledge of this information about the Juror during the trial and their communication of this information to the "defense team" is sufficient to establish that the evidence is not newly discovered. In addition, the information provided by the defense team concerning their knowledge of this matter is very vague. The affidavits submitted by Mr. Phillips were ambiguous, and at no time did the defense team submit affidavits from Mr. Eggleston or Defendant concerning the manner or timing in which they obtained this knowledge about the Juror. Moreover, Defendant did not provide the Court with a clear statement as to how this knowledge was obtained. In fact, it was not until Phillip's Third Affidavit that the source of the knowledge was identified as Ms. Mitchell. However, Defendant did not call Ms. Mitchell to testify at the hearing to help establish their claim, but rather she had to be called by the Government.

38. The testimony supplied by Ms. Mitchell is not credible. Initially, Ms. Mitchell is employed by Defendant's father, and therefore has a motive to lie. This motive, coupled with the fact that her testimony was contradicted on several key points by individuals who have no motive to fabricate their testimony leads this Court to discredit her testimony.

39. Furthermore, Ms. Mitchell failed to remember important events. She was uncertain as to the first person she told about knowing the Juror and when such revelation occurred. She initially testified that the first person she told was Mr. Eggleston, but she later testified that she first told Peter Pelullo, Sr. Ms. Mitchell also testified that Peter Pelullo, Sr. instructed her to call Defendant's attorneys with this information, but she also testified that she called Mr. Eggleston on her own accord when she found his name in the Rolodex at work.

40. Peter Pelullo, Sr., as Defendant's father, also has a strong motive to lie. Like Ms. Mitchell, his testimony is inconsistent

with other witnesses on important matters. In particular, his testimony concerning his conversation with Mr. Grimes was contradicted in every facet by Mr. Grimes, who has no motive to lie and is quite upset about being dragged into this matter.

41. Defendant, possibly facing a long prison term for this conviction, has a strong motive to lie. Moreover, Defendant's testimony was vague, inconsistent and evasive on important issues. Defendant did not deny his involvement in ordering the transcript on an expedited basis, but he was very evasive as to whether he gave the instructions to order the voir dire in this manner.

42. Given the lack of evidence produced by Defendant, and the fact that the evidence he did produce was inconsistent, vague and evasive, this Court finds that Defendant has failed to establish 1) that this is newly discovered evidence or 2) that the failure to discover this information was not due to a lack of diligence on the part of the defense team.

### C. *CONCLUSIONS OF LAW*

1. In order to succeed on his Motion, Defendant must show that: 1) the information contained in his Motion is newly discovered; and 2) that the failure to discover this information was not a result of the defense team's lack of due diligence. *United States v. Ashfield,* 735 F.2d 101, 112 (3d Cir.1984), *cert. denied,* 469 U.S. 858, 105 S.Ct. 189, 83 L.Ed.2d 122 (1984); *United States v. Rocco,* 587 F.2d 144, 146 (3d Cir.1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) *United States v. McKinney,* 952 F.2d 333 (9th Cir.1991); *United States v. Bolinger,* 837 F.2d 436, 438–439 (11th Cir.1988); *United States v. Jones,* 597 F.2d 485, 488 (5th Cir.1979).

2. Based on the above findings, Defendant has failed to meet this burden of proof.

■ 3. Defendant was aware of this information pertaining to the Juror during his trial. Because he chose to remain silent on this matter, he has waived his right to raise this issue after the verdict. *United States v. McKinney,* 952 F.2d 333 (9th Cir.1991); *United States v. Bolinger,* 837 F.2d 436, 438–439 (11th Cir.1988); *United States v. Jones,* 597 F.2d 485, 488 (5th Cir.1979); *United States v. Morris,* 977 F.2d 677, 685 (1st Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1588, 123 L.Ed.2d 155 (1993); *United States v. Diaz–Albertini,* 772 F.2d 654, 657 (10th Cir.1985).

4. Even if Defendant established that the Juror had given untruthful answers during voir dire, he has failed to allege that the correct answers would provide a proper basis to challenge for cause. *McDonough Power Equip, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984).

■ 5. Defendant argues that the Court should have ordered the Juror to testify about the answers she gave during voir dire, rather than have a hearing to determine whether the evidence concerning the Juror was newly discovered. Defendant maintains that "a post-trial jury hearing must be held when a party comes forward with 'clear, strong substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred." *United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir.1989) (citations omitted). This Court disagrees with Defendant's argument in this situation. Initially, Defendant has not come forward with "clear, strong substantial and incontrovertible evidence". *Id.* Moreover, Defendant's argument leads to the conclusion that a defendant has no duty to inform the court of information in his possession during trial concerning a juror's alleged inability to serve on the jury. According to Defendant, one may wait until after the verdict and then raise the juror issue in a post-trial motion. Defendant would then have the court automatically call the accused juror to testify without first determining whether the information is newly discovered. Defendant's proposition contradicts established law. *Tanner v. United States,* 483 U.S. 107, 120, 107 S.Ct. 2739, 2747–48, 97 L.Ed.2d 90 (1987). *United States v. Gilsenan,* 949 F.2d 90, 97 (3d Cir.1991), *United States v. McKinney,* 952 F.2d 333 (9th Cir.1991); *United States v. Bolinger,* 837 F.2d 436, 438–439 (11th Cir.1988); *United States v. Jones,* 597 F.2d 485, 488 (5th Cir.1979).

6. Defendant also contends that pursuant to 28 U.S.C. § 1865(b), if the Juror was convicted of a crime punishable by more than one year in prison, then he is *automatically* entitled to a new trial. This Court concludes that Defendant's argument is without merit on this matter, and that 28 U.S.C. § 1865(b) does not require the automatic granting of a new trial in such a situation. *Ford v. United States*, 201 F.2d 300 (5th Cir.1953); *United States v. Humphreys*, 982 F.2d 254, 260–62 (8th Cir.1992).

7. The Government urges this Court to conclude that, based on the above evidence, Defendant made improper attempts to reach and compromise the Juror. While there is substantial evidence to support such a finding, it is not necessary for this Court to reach that issue in deciding this Motion. Therefore, the Court declines the Government's invitation to make such a finding.

8. For the above-stated reasons, Defendant's Motion for a New Trial Based on Newly Discovered Evidence, or in the alternative to Hold an Evidentiary Hearing is denied.

## II. *MOTION TO SET ASIDE THE CONVICTION ON COUNT 54 AND DISMISS THE INDICTMENT PURSUANT TO 28 U.S.C. § 2255*

Prior to the fourth trial, Defendant filed a motion pursuant to 28 U.S.C. § 2255 asking this Court to set aside the conviction on Count 54 and to dismiss the indictment due to alleged violations by the Government of its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[9,10] According to Defendant, the conviction of Count 54 should be set aside because the Government failed to turn over three pieces of evidence that he claims would have established at the first trial that he was innocent of these charges. Defendant also asks the Court to dismiss the indictment because the Government's failure to turn over this material was intentional and designed to deprive him of his constitutional right to a fair trial. While Defendant attempts to paint a picture of extreme prosecutorial misconduct, the record does not support Defendant's claim.[11]

At the first trial Defendant was convicted of Count § 4, which charged him with diverting $114,000 of corporate funds on or about February 25, 1986, to his personal use in order to repay a personal loan obtained from a loanshark, Anthony DiSalvo.[12] During the various trials, Philip Leonetti, the Underboss of the Philadelphia mafia, testified that DiSalvo contacted him at the end of December 1985 and asked for his assistance in collecting the loan, which Defendant had failed to repay. According to Leonetti, he agreed to aid in the collection of this loan in return for a percentage of the proceeds. Leonetti and Nicodemo Scarfo, the head of the Philadelphia mafia, met with Defendant on two occasions in Florida in early 1986 and advised Defendant that he had to repay the loan. Defendant thereafter diverted $114,000 from a corporate bank account and wired the money to a family corporation in Philadelphia, where the money was converted to cash and used to repay the loan to DiSalvo.

During the course of the second trial, it was learned that the Government did not turn over a memorandum of an IRS interview of Leonetti. The IRS interview memorandum indicated that Leonetti was not announced as underboss of the mob until March 1986. According to Defendant, because Leonetti testified that DiSalvo sought

---

9. There was confusion on the part of Defendant as the manner in which to get his Motion before the Court. While it was filed as a separate civil action at 94–7266, Defendant sought to have it considered as part of his criminal case and to have the Court rule on the instant motion prior to the fourth trial. However, the first time Defendant asked for a ruling to be made prior to the fourth trial was on the date that the fourth trial was to begin.

10. *Brady* violations come within the purview of 28 U.S.C. § 2255 and make Defendant's conviction on Count 54 subject to collateral attack in this fashion. *United States v. Biberfeld*, 957 F.2d 98, 103 (3d Cir.1992); *Carter v. Rafferty*, 826 F.2d 1299 (3d Cir.1987).

11. By Order dated February 8, 1995, this Court ordered the Government to respond to this Motion.

12. The conduct underlying Count 54 also serves as Racketeering Act 60.

his assistance as Underboss, the IRS interview showed that the repayment of the DiSalvo loan could not have occurred until after March 1986. In Defendant's appeal of his second conviction, the Third Circuit determined that this constituted a *Brady* violation, but affirmed the conviction on Count 54 for a second time because "the *Brady* evidence ... does not lead to a 'reasonable probability' that the result of the proceeding would have been different." *Pelullo,* 14 F.3d at 887.

Defendant now argues that during the third trial, the Government produced three additional pieces of alleged *Brady* material, and that if this material had been available at the first trial, Defendant would not have been convicted on Count 54. Defendant also contends that if the Third Circuit had been aware of this additional material during the appeal of the second conviction, it would not have affirmed the conviction. Defendant also seeks dismissal of the indictment based on these alleged *Brady* violations that he claims result from intentional prosecutorial misconduct.

 Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. In order to find a *Brady* violation, "1) the prosecution must suppress or withhold evidence, 2) which is favorable, and 3) material to the defense." *United States v. Ramos,* 27 F.3d 65, 68 (3d Cir.1994), *quoting, United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir.1991). Evidence is favorable to the defendant if it would make the difference between conviction and acquittal. *Brady* material includes exculpatory as well as impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the re-

sult of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.*

Defendant argues that the Government failed to turn over the following three pieces of alleged *Brady* material prior to the first trial: 1) the handwritten notes underlying FBI Agent Kurtz's interview memorandum; 2) the handwritten notes underlying FBI Agent Wolverton's 302;[13] and 3) FBI surveillance records of Scarfo's home in Florida, where the meetings between Leonetti, Scarfo and Defendant occurred. Defendant contends that this evidence corroborates his position "that the DiSalvo loan was not repaid until the Summer 1986; that the $114,000 wire transfer was used to repay a debt to his father, not to DiSalvo; and that [Defendant] did not meet with Leonetti and Scarfo at Scarfo's home in January to discuss the DiSalvo loan." Defendant's Brief at 11.

On March 10, 1995, this Court held a hearing on this matter. At the hearing, Defendant was given the opportunity to cross-examine Assistant United States Attorney ("AUSA") Ronald Cole concerning an affidavit that he attached to the Government's Response, wherein he stated that the Government did not intentionally withhold any *Brady* material.

 Prior to the first trial, Defendant filed a motion requesting *Brady* material in the possession of the Government, but did not specifically request the agents' rough notes. The Government turned over all material that it considered to be covered by *Brady,* but did not turn over the material at issue because the Government did not consider it *Brady* material. Prior to the second trial, Defendant made a request for the production of handwritten notes from the June 14, 1990 interview of Defendant. The Government did not produce the agents' rough notes on this occasion for the same reason. Prior to the third trial, Defendant again re-

---

**13.** The FBI-302 at issue states: "The $114,000 wire transfer from the debtor-in-possession account [Palm Beach Heights] to LRP, INC. was used to repay TONY DI SALVO. PELULLO stat-

ed he borrowed money from TONY DI SALVO but there would be no documentation of the loan." Exhibit D-3 of 03/10/95 Hearing.

quested the agents' rough notes. After oral argument, the Government agreed to produce the agents' rough notes out of "an abundance of caution", despite its belief that it was under no obligation to do so. Government's Response at 6.

The Government did not turn over the rough notes prior to the first two trials based on its belief that Defendant was not entitled to them. According to AUSA Cole, he attended the June 14, 1990 interview of Defendant and knew that the FBI–302 was consistent with the statements made by Defendant during the interview, including the admission by Defendant that he used the $114,000 to repay the DiSalvo loan. Cole Affidavit. AUSA Cole further stated that at no time during the interview did Defendant state that he used the $114,000 to repay an intercompany debt. Id. Because of the consistency between the interview and the FBI–302, AUSA Cole stated that he had "no reason to examine Agent Wolverton's rough notes to determine whether they were inconsistent with the FBI–302", and therefore, no reason to believe that they constituted Brady material. Id. at ¶ 5.

The Government also argues that Defendant was not entitled to the agents' rough notes because Defendant failed to make any showing that the FBI–302 was inconsistent with his June 14, 1990 interview. United States v. Walden, 578 F.2d 966 (3d Cir.1978); United States v. Ramos, 27 F.3d 65 (3d Cir.1994); United States v. Pou, 953 F.2d 363, 366–67 (8th Cir.1992); United States v. Navarro, 737 F.2d 625 (7th Cir.), cert. denied, 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984). The Government argues that these cases require a defendant to make a threshold showing that the FBI–302 is inconsistent with the statements made in the interview before the government is required to turn over rough notes. Mere speculation of inconsistency on the part of the defendant is insufficient to trigger a court to perform an in camera review of the materials. United States v. Robinson, 585 F.2d 274 (7th Cir.1978), cert. denied, 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979); United States v. Pou, 953 F.2d 363, 366–67 (8th Cir.1992);

United States v. Navarro, 737 F.2d 625 (7th Cir.), cert. denied, 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984); United States v. Hernandez, 31 F.3d 354 (6th Cir.1994).

This Court agrees with the Government's argument. To hold otherwise would force an in camera review of all of the government's handwritten notes based on a bare allegation of inconsistency by a defendant. In this role, the courts would merely serve as a discovery device for defendants. Needless to say, this would create a tremendous, and unnecessary, burden on the courts. In the matter at hand, Defendant failed to make any showing of the existence of inconsistencies between the FBI–302 and the statements made during the interview.

### A. The Evidence Is Not Exculpatory

Defendant has failed to show that the materials are exculpatory. The Court will analyze each piece of evidence separately.

#### 1. The Notes of Agent Kurtz

On November 7, 1989, IRS Agent Kurtz interviewed Leonetti concerning an investigation of attorney Robert Simone. During the course of that interview, Leonetti referred to Defendant's loan with DiSalvo. In what Defendant has termed "the most egregious violation" [14] of the Government's duty under Brady, Defendant contends that the Government suppressed the handwritten notes of IRS Agent Kurtz. Agent Kurtz's notes of the interview contain a notation "Summer 1986" near information pertaining to Defendant's repayment of the DiSalvo loan. Defendant takes this notation to mean that Leonetti told Agent Kurtz that the DiSalvo loan was repaid in the summer of 1986, and therefore the $114,000 wire transfer of February 25, 1986 could not have been used to repay the DiSalvo loan as charged in the Indictment. Defendant also argues that the handwritten notes are material because "the date of repayment of the DiSalvo loan was essential to tie it into the $114,000 wire transfer." Defendant's Brief at 13.

However, Agent Kurtz testified at trial that the notation "Summer 1986" was not based on any statement by Leonetti.

---

14. Defendant's Brief at 12.

10/17/94 N.T. at 272, 274. Rather, Agent Kurtz testified that the notation "Summer 1986" appears "out to the side a little bit" of his notes and is in fact a note to himself to establish that the repayment of the loan merely continued through the summer of 1986. Moreover, Leonetti testified that it was not possible that he received his "take" from DiSalvo in the Summer of 1986. 10/11/94 N.T. at 112–13.

Therefore, the "Summer 1986" notation is not a statement that Leonetti made to Agent Kurtz, and as such, it is not exculpatory within the meaning of *Brady*.

### 2. *Agent Wolverton's Rough Notes*

Defendant was interviewed on June 14, 1990. Present at the interview were FBI Agents Wolverton and Leyden, AUSA Cole, Defendant, and Defendant's attorneys Fred Schwartz and Barry Richard. Agent Wolverton took notes during the interview. The Government presented evidence from Agents Wolverton and Leyden at various trials that Defendant admitted that he used the $114,-000 to repay a personal loan to DiSalvo. 10/14/94 N.T. at 30–31; 01/19/95 N.T. at 6–7; 01/20/95 N.T. at 53. Defendant's position is that the $114,000 wire transfer was not used to repay the DiSalvo loan, but was used to pay an intercompany debt to LRP, Inc. Co., which belongs to Defendant's father.

Agent Wolverton's rough notes contain the notations "LRP, Inc. Co. belongs to father", "repaying intercompany debt" and "used $114,000 to repay Tony DiSalvo". Wolverton Notes at 13. Attached as Exhibit 5 to Defendant's Motion. Defendant argues that this supports his contention that he informed the agents during the interview that the $114,000 was used to repay an intercompany debt to his father.

Agent Wolverton testified that his notes are not a verbatim transcript of what was said in the interview. 01/20/95 N.T. at 37. He further testified that the note "repaying intercompany debt" was not a statement made by Defendant, but rather was a note he had written to remind himself to ask Defendant about the purpose of the wire transfer. 10/14/94 N.T. at 160–61; 01/20/95 N.T. at 181–84.

Moreover, Agent Leyden testified at the third and fourth trials that Defendant admitted during the interview that the $114,000 was used to repay the DiSalvo loan. 10/13/94 N.T. at 95–96; 01/19/95 N.T. at 6, 18–19. Agent Leyden further testified that at no time during the interview did Defendant state that the $114,000 was used to repay an intercompany debt. *Id.*

Furthermore, Defendant was provided with copies of the FBI–302 shortly after his indictment. As such, Defendant was aware that the Agents were going to testify about his admission of the use of the $114,000. However, at that time Defendant did not attempt to obtain the rough notes by arguing that the FBI–302 was inconsistent with what occurred in the interview, which could have been accomplished by presenting statements from his attorneys who were present at the interview. Furthermore, Defendant was obviously present at the interview, and therefore aware of what was stated at the interview. His failure to come forth with a statement showing the manner in which the FBI–302 was inconsistent with the interview is further evidence that the note came from the mind of Agent Wolverton and was not stated by Defendant.

In addition to the testimony of Leonetti, Agent Wolverton and Agent Kurtz, there exists evidence showing that the $114,000 wire transfer was used to repay the DiSalvo loan. An associate of Defendant testified that Defendant asked him to obtain $114,000 in cash from a bank account that had no connection to the Art Deco Hotel project. When that was unsuccessful, Defendant asked the associate to wire $114,000 to LRP Corp., which did not perform any work on the Art Deco project. Moreover, the bank statements establish that $114,000 was wired on or about February 25, 1986. Also, there does not exist any documentation referencing an intercompany debt between LRP Inc. and Palm Beach Heights. Finally, Arthur Pelullo, Defendant's brother, testified that he cashed nine checks totaling $114,000 immediately after the money entered the LRP account.

### 3. *The FBI Surveillance Reports*

Defendant next argues that the Government was in possession of FBI surveillance reports of Scarfo's home in Florida for December 1985 and January 1986, which is the time period that Leonetti and Scarfo met with Defendant. According to Defendant, the FBI surveillance reports are exculpatory because they do not mention Defendant's visits to Scarfo's house during that time period, and as such corroborate his position that he did not meet with Leonetti and Scarfo in Florida in January 1986.

The surveillance reports show that the FBI conducted sporadic surveillance of Scarfo's house during this time period. The reports show that no surveillance was conducted on January 1, 3, and 5–21. Moreover, the surveillance reports show that the agents were unable to identify several white males that arrived at Scarfo's house during the relevant time period. These unidentified white males could have included Defendant. In fact, Defendant admitted that he did visit Scarfo's house during this time period, but still contends that his failure to be identified on the surveillance reports somehow supports his position that he did not meet with Leonetti and Scarfo. This Court cannot agree with such a baseless argument.

### B. *The Evidence Is Not Material*

██ Even if the above referenced evidence was determined to be exculpatory, it is not material. Defendant attaches great significance to the fact that he possessed all of this material for the first time at the third trial, and it resulted in a hung jury. However, Defendant also had all of this material available to him at the fourth trial, and the jury found that he committed Racketeering Act 60, which is the identical conduct charged in Count 54. Moreover, after analyzing the entire record, this Court finds that there does not exist a "reasonable probability" that the result on Count 54 would have been different had the Defendant been in possession of this additional information at the first trial.

### C. *Defendant's Request to Dismiss the Indictment*

██ Defendant also asks this Court to dismiss the indictment because of the alleged "egregious conduct" by the Government. Defendant's Brief at 18. Defendant contends that the Government's failure to turn over this alleged *Brady* material was intentional and warrants dismissal of the indictment. Defendant urges this Court to extend the holding of *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), wherein the Court held "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676, 102 S.Ct. at 2089. Defendant would ask this Court to hold that double jeopardy also bars retrial where the government intentionally violates its *Brady* obligations.

This Court refuses Defendant's request. This Court has previously determined that the government did not commit any *Brady* violations. Moreover, even if any *Brady* violations were committed, this Court finds that they were not intentional on the part of the Government. As previously noted, this Court credits the Government's reasons for not turning over the rough notes prior to the trials.

Moreover, there is no support for Defendant's contention that the Government intentionally withheld Agent Kurtz's notes. Agent Kurtz works for the IRS and was investigating Robert Simone. The investigation of Defendant was conducted by the FBI. There simply was no basis for AUSA Cole to believe that the IRS investigation of Simone would uncover information about Defendant's use of corporate funds to repay a personal debt. Moreover, all known interviews of Leonetti were turned over by the Government prior to the first trial.

Regarding Agent Wolverton's rough notes, AUSA Cole was present at the interview and heard Defendant admit to using the $114,000 to repay the DiSalvo loan. Therefore, AUSA Cole had no basis to believe that the rough notes differed from the FBI–302 because the FBI–302 coincided with his recollection of the interview.

Therefore, this Court finds that the Government did not intentionally withhold this material from Defendant, and denies Defendant's request to dismiss the indictment.

### D. *Defendant's Rule 16 and Jencks Act Arguments*

Defendant, in his reply brief, also contends that he was entitled to this material under Rule 16 of the Federal Rules of Criminal Procedure and the Jencks Act, 18 U.S.C. § 3500.

 Rule 16 requires the Government to turn over any statement made by a defendant that is in the possession of the Government. The Government, in the matter at hand, has turned over to Defendant FBI–302s of the interview. The turning over of the 302s fulfills the Government's duty to disclose under Rule 16 by producing a type written memorandum summarizing Defendant's statement to the agents. *United States v. Koskerides,* 877 F.2d 1129, 1133 (2d Cir.1989); *United States v. Holloway,* 740 F.2d 1373, 1381 (6th Cir.), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984).

 Moreover, this was not a statement made by Defendant. Agent Wolverton has testified that he made the note "repaying intercompany debt" as a reminder to himself to question Defendant in this regard. Agent Leyden and AUSA Cole testified that Defendant did not state during the interview that the $114,000 was used to repay an intercompany debt. This Court finds that the notation "repaying intercompany debt" does not relate to a statement made by Defendant, and therefore is not discoverable pursuant to Rule 16(a). Moreover, this would appear to qualify as an internal memorandum made by a government agent in connection with an investigation, and not discoverable under Rule 16(a)(2).

 Defendant next argues that under the Jencks Act, the rough notes constitute a statement by Agent Wolverton. "The Jencks Act requires a court, upon motion of the defendant and after direct examination of a

government witness, to order the United States to produce to the defense 'any statement ... of the witness in [its] possession ... which relates to the subject matter as to which the witness has testified." *United States v. Ramos,* 27 F.3d 65 (3d Cir.1994), *quoting,* 18 U.S.C. § 3500(b). A statement under the Jencks Act consists of a written statement by the witness that is "signed or otherwise adopted by him", or a "substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with making of such oral statement." 18 U.S.C. § 3500(e).

In *Ramos,* the Third Circuit Court of Appeals rejected an identical argument as is presented by Defendant. In that case, the Third Circuit held that rough notes like those in the matter at hand, do not fall within the purview of 18 U.S.C. § 3500. The rough notes of Agent Wolverton are not "substantially verbatim recitals" of anything he said, nor were the rough notes later adopted by him in any manner. *Id.* Moreover, the evidence is clear that the rough notes are simply reminders by Agent Wolverton to himself to ask Defendant certain questions.

For these reasons, Defendant's Motion Pursuant to 28 U.S.C. § 2255 to Set Aside the Conviction on Count 54 and Dismiss the Indictment is denied.

### III. *RULES 29(C) AND 33 MOTION FOR NEW TRIAL*

Subsequent to the fourth trial, Defendant filed the instant Motion for Judgment of Acquittal Pursuant to Rule 29(c), or In the Alternative, For a New Trial Pursuant to Rule 33. In this Motion, Defendant incorporates the arguments made in his § 2255 motion, and makes the additional argument that the Court erred in permitting the Government to read into evidence prior statements of Defendant that were made under oath.[15] For the reasons the follow, Defendant's Motion is denied.

 The statements at issue were made by Defendant under oath 1) at civil depositions for the Securities and Exchange Commission and 2) at the first two trials in this

---

**15.** Defendant's motion incorporated his motion pursuant to 28 U.S.C. § 2255. These matters have been previously addressed by this Court in this opinion, and need not be repeated herein.

matter. Defendant now contends that this was error because:

> (1) the admission of the statements constituted an implicit and impermissible comment on his failure to testify in the instant trial, (2) that the government's late-in-the-trial identification of the statements it sought to offer against the defendant constituted the impermissible sandbagging of the defense since many of these statements related to witnesses who had already testified at trial, including Leonetti and Swenson, and (3) that the defendant only testified at the prior trials as a result of the erroneous rulings by this court and trial tactics by the government made at these trials.

Defendant's Brief at 1.

At trial, the Court admitted these statements as admissions pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence. The statements were also relevant pursuant to Rule 401 and their relevance was not substantially outweighed by any unfair prejudice pursuant to Rule 403.

The Government's introduction of the statements made by Defendant is not a comment on his failure to testify. *United States v. Parker*, 549 F.2d 998 (5th Cir.1977). The statements are relevant because they show admissions made by Defendant under oath. The position advocated by Defendant would preclude the government from introducing any admissions by a defendant if that defendant decided not to testify. The result of this would be to grant immunity to a defendant for any prior admission. Moreover, the statements were presented in the Government's case in chief, at which point the Government did not know whether Defendant was going to testify.

Defendant next contends that the timing of the introduction of these statements "sandbagged" him because he was prevented from cross-examining some of the Government witnesses about the admissions. If the Defendant desired to cross-examine these witnesses concerning the admissions, he could have had them recalled to the stand. Defendant did not do so. Moreover, Defendant offers no explanation about the prejudice that resulted from the admission of these statements, or how the witnesses may have contradicted his admissions. Therefore, this Court finds Defendant's argument without merit.

Defendant's final argument is that the statements from the prior trials should not have been admitted because he only testified at the prior trials due to erroneous rulings by this Court and the trial tactics of the Government. Defendant argues that if the Government had provided the alleged *Brady* material prior to the first trial, he would not have testified at any trial. As previously discussed, this Court has determined that the evidence does not constitute *Brady* material.

Moreover, Defendant offers no explanation as to why he would not have testified had he been in possession of these materials. As to Agent Wolverton's rough notes, even if Defendant did state during the interview that the $114,000 was used to "repay intercompany debt", he did not need Agent Wolverton's notes to remind him of this. In fact, Defendant would not have had to testify in order to establish that he made this statement because he could have called one of his attorneys who were present at the interview to testify accordingly.

As to the Kurtz material, Defendant was in possession of the memorandum and notes of Agent Kurtz's interview of Leonetti at the second trial, but Defendant still testified on his own behalf. Therefore, there is simply no merit to this argument.

As to the FBI surveillance records, these were made available to Defendant prior to the third trial. However, Defendant made no use of the surveillance records after he received them. Moreover, Defendant admitted at the first trial that he was at Scarfo's house during the relevant period. If he was not at the house, there was simply no reason for Defendant to testify as such at the first trial. Therefore, the lack of this material in no way compelled Defendant to testify at the prior trials.

For the above stated reasons, Defendant's Motion is denied.

## IV. *DEFENDANT'S MOTION FOR PRODUCTION OF ROUGH NOTES FROM ALL INTERVIEWS*

On March 14, 1995, Defendant filed motions requesting the rough notes of the interviews of his brothers, Arthur and Peter Pelullo, Jr., as well as all rough notes, memoranda of interviews, and grand jury transcripts of all persons interviewed by the Government in connection with this prosecution. Defendant has filed these Motions in an attempt to create the impression that there was severe prosecutorial misconduct in this matter. For the reasons that follow, Defendant's Motions are denied.

Defendant's Motions are untimely. The trial in this matter concluded two months prior to Defendant's Motions being filed with this Court. Defendant offers no authority that would allow him to request discovery subsequent to the verdict. Rules 33 and 34 of the Federal Rules of Criminal Procedure require that motions for a new trial or arrest of judgment be filed within seven days of the verdict. Defendant has not done this nor sought leave of this Court to file these motions outside of the relevant time period. While the Motions are denied on this basis, the Court will further analyze Defendant's Motions.

Defendant's first Motion requests the production of the rough notes of the interviews of Arthur and Peter Pelullo. Prior to the third trial, Defendant made a request for the rough notes pertaining to the interviews of Arthur and Peter Pelullo. In the third and fourth trials, Defendant, for the first time took the position that the FBI–302s of these interviews were inconsistent. Defendant specifically contends that the FBI–302 of Arthur's interview is inconsistent because Arthur now claims that he denied telling the agents that the $114,000 was used to repay DiSalvo.

However, the testimony of Arthur Pelullo does not show that the FBI–302 is inconsistent with the interview. Arthur Pelullo testified that he did tell the agents that the $114,000 was used to repay DiSalvo, but he did so only because he was told that his brother Peter informed the agents that the $114,000 was used in that manner.

As to Defendant's Motion for the production of rough notes and grand jury transcripts of all witnesses interviewed by the Government, Defendant makes this request based on his belief that the Government has committed several *Brady* violations in this trial. According to Defendant, because AUSA Cole did not review the rough notes of Agent Wolverton, there may be *Brady* material in the Government's files, and this Court should review the entire Government file in order to assure Defendant that no such material exists. However, this Court has previously determined that no *Brady* violations were committed. Moreover, Defendant must make some sort of showing that there exists inconsistencies between the interview and the FBI–302. Defendant has failed to do this. Defendant is simply asking this Court to become a discovery device on his behalf. The Court will deny this request.

## V. *DEFENDANT'S SUPPLEMENTAL MOTION AS TO JUROR MISCONDUCT*

Defendant filed a Motion asking this Court to allow him to supplement his prior motion as to juror misconduct because he has learned that the Juror, as well as some other relatives of the Juror, may have been arrested for crimes that carry a term of imprisonment of more than one year. Defendant requests a hearing on this matter to determine if the Juror was competent to serve pursuant to 28 U.S.C. § 1865 and to determine if the Juror intentionally failed to answer questions posed during voir dire. At the hearing, Defendant would also like to inquire of the Government when and how it first learned of the identity of the Juror's murdered sister.

Defendant has simply presented no reasonable basis for this Court to grant his Motion. Defendant's allegations are simply that, allegations for which he has failed to offer any evidence. In fact, Defendant states that he has learned some of this information "second hand" and that "counsel for Mr. Pelullo have been advised" of certain matters, but never offers any concrete evidence or gives any indication that the information is

in any way reliable. Moreover, Defendant asks to inquire of the Government when and how it first learned that the Juror was related to Donna Willard, but offers no basis for his belief that the Government did indeed know this information before anyone else connected with these proceedings had such knowledge. Defendant is simply on a fishing expedition in the hope of uncovering some fact about the Juror that would deem her not qualified under 28 U.S.C. § 1865. Moreover, this Court has previously found that Defendant has put forth evidence that is not credible concerning his allegations of juror misconduct. Defendant's instant Motion is based on rampant speculation and is denied.

### ORDER

AND NOW, this 8th day of August, 1995, upon consideration of Defendant's Motion for a New Trial Based on Newly Discovered Evidence of Juror Misconduct; Defendant's Motion Pursuant to 28 U.S.C. § 2255 to Set Aside the Conviction on Count 54 and Dismiss the Indictment; Defendant's Motion for Judgment of Acquittal or For a New Trial; Defendant's Motion for the Production of Rough Notes of All Interviews; Defendant's Motion for the Production of Rough Notes of the Interviews of Arthur and Peter Pelullo, Jr.; and Defendant's Motion to Supplement His Motion as to Juror Misconduct, all responses thereto and hearings on said matters, it is hereby ORDERED that:

1. Defendant's Motion for a New Trial Based on Newly Discovered Evidence of Juror Misconduct is DENIED;

2. Defendant's Motion Pursuant to 28 U.S.C. § 2255 to Set Aside the Conviction and to Dismiss the Indictment is DENIED;

3. Defendant's Motion for Judgment of Acquittal or For a New Trial is DENIED;

4. Defendant's Motion for the Production of Rough Notes of All Interviews is DENIED;

5. Defendant's Motion for the Production of Rough Notes of the Interviews of Arthur and Peter Pelullo, Jr. is DENIED; and

6. Defendant's Motion to Supplement His Motion on Juror Misconduct is DENIED.